**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

————————————————————

TEXAS CHILDREN'S HOSPITAL and )
SEATTLE CHILDREN'S HOSPITAL,   )
                               )
            Plaintiffs,        )
                               )
        v.                     )
                               ) Civil Action No. 14-2060 (EGS)
SYLVIA MATHEWS BURWELL,        )
Secretary, United States       )
Department of Health and       )
Human Services, et al.,         )
                               )
            Defendants.         )
————————————————————

**MEMORANDUM OPINION**

Medicaid is a federal program that helps to cover the costs of providing medical care to certain individuals. Some hospitals treat significantly higher percentages of Medicaid-eligible patients than others. Because Medicaid does not generally provide the same level of reimbursement as other forms of coverage, such hospitals are often at a financial disadvantage. To rectify this disadvantage, and thereby to encourage hospitals to serve Medicaid-eligible patients, Congress has provided for supplemental Medicaid payments to such hospitals. The supplemental payments are subject to limits to ensure that no hospital receives such a large payment that it makes a profit, rather than merely covering its Medicaid-related costs. This case concerns the method of calculating that limit.

Plaintiffs, Texas Children's Hospital ("Texas Children's") and Seattle Children's Hospital ("Seattle Children's"), allege that the Secretary of Health and Human Services ("the Secretary"), the Centers for Medicare and Medicaid Services ("CMS"), and the Administrator of CMS have modified the method for calculating the hospital-specific limit without following notice-and-comment procedures, and in a way that conflicts with the Medicaid Act. Because defendants' calculation is allegedly being used to force Texas and Washington to recoup significant amounts of money from the plaintiffs, and because such recoupments are allegedly both irrevocable and imminent, plaintiffs seek a preliminary injunction. Upon consideration of the plaintiffs' motion, the response, reply, and surreply thereto, the applicable law, and the entire record, the Court **GRANTS** plaintiffs' motion.

I.   **Background**

"Plaintiffs are two not-for-profit pediatric teaching and research hospitals dedicated to the treatment and special needs of children and the advancement of pediatric medicine." Compl. ¶ 1. They treat "[c]hildren with critical illnesses and special needs . . . from throughout the United States," and do so "regardless of their families' ability to pay for their care." *Id.* "More than 50 percent of Plaintiffs' patients are Medicaid patients," which means that they "treat a disproportionately larger share of Medicaid program patients." *Id.* ¶¶ 2-3.

Plaintiffs also "serve many . . . very sick and medically
fragile children," meaning that "they have an unusual number of
patients who meet the qualifying criteria for Medicaid
eligibility for reasons other than income status." *Id.* ¶ 48.

### A.   The Medicaid Act

Medicaid, 42 U.S.C. § 1396, *et seq.*, "provid[es] federal
financial assistance to States that choose to reimburse certain
costs of medical treatment for needy persons." *Harris v. McRae*,
448 U.S. 297, 301 (1980). In addition to covering low-income
individuals, Medicaid also provides benefits to children with
certain serious illnesses, without regard to family income. *See,
e.g.*, 42 U.S.C. § 1396a(10)(A)(i)(II) (children are eligible for
Medicaid if they are eligible for Supplemental Security Income);
42 C.F.R. § 416.926a(m)(6) (children born weighing less than
1,200 grams are eligible for Supplemental Security Income).

To encourage states to participate in Medicaid, "[f]ederal and
state governments jointly share the cost." *Va. Dep't of Med.
Assistance Servs. v. Johnson*, 609 F. Supp. 2d 1, 2 (D.D.C.
2009). Participating states administer their own program
"pursuant to a state Medicaid plan which must be reviewed and
approved by the Secretary." *Id.; see also* 42 U.S.C. § 1396a.
Once the Secretary or her designee approves a state plan, the
state receives federal financial participation to cover part of
the costs of its Medicaid program. 42 U.S.C. § 1396b(a)(1). If a

state fails to comply with the statutory or regulatory requirements governing Medicaid, the federal government may recoup federal funds from the state. *See id.* § 1316(a), (c)-(e).

In 1981, facing "greater costs . . . associated with the treatment of indigent patients," *D.C. Hosp. Ass'n v. District of Columbia*, 224 F.3d 776, 777 (D.C. Cir. 2000), Congress amended Medicaid to require states to ensure that payments to hospitals "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. § 1396a(13)(A)(iv). This amendment reflected "Congress's concern that Medicaid recipients have reasonable access to medical services and that hospitals treating a disproportionate share of poor people receive adequate support from Medicaid." *W. Va. Univ. Hosps. v. Casey*, 885 F.2d 11, 23 (3d Cir. 1989). "The intent was to stabilize the hospitals financially and preserve access to health care services for eligible low-income patients." *Johnson*, 609 F. Supp. 2d at 3. The amendment created "payment adjustment[s]" for qualifying hospitals. *See* 42 U.S.C. § 1396r-4(c). Such payments are available to any hospital that treats a disproportionate share of Medicaid patients (a disproportionate-share hospital or "DSH"). *See id.* § 1396r-4(b).

In 1993, the program was amended to limit DSH payments on a hospital-specific basis. *See id.* § 1396r-4(g). This was done to

assuage concerns that some hospitals were receiving DSH payments in excess of "the net costs, and in some instances the total costs, of operating the facilities." H.R. Rep. No. 103-111, at 211 (1993), *reprinted in* 1993 U.S.C.C.A.N. 278, 538.

Accordingly, a DSH payment may not exceed:

> [T]he costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A).

In 2003, to ensure the appropriateness of DSH payments, Medicaid was amended to require that each state provide an annual report and an audit of its DSH program. *See id.* § 1396r-4(j). The audit must confirm, among other things, that:

> (C) Only the uncompensated care costs of providing inpatient hospital and outpatient hospital services to individuals described in [Section 1396r-4(g)(1)(A)] . . . are included in the calculation of the hospital-specific limits[;]
>
> (D) The State included all payments under this subchapter, including supplemental payments, in the calculation of such hospital-specific limits[; and]
>
> (E) The State has separately documented and retained a record of all of its costs under this subchapter, claimed expenditures under this subchapter, uninsured costs in determining payment adjustments under this section, and any payments made on behalf of the uninsured from payment adjustments under this section.

*Id.* § 1396r-4(j)(2). Overpayments must be recouped by the state within one year of their discovery or the federal government may reduce its future contribution. *See id.* § 1396b(d)(2)(C), (D).

**B.   The 2008 Final Rule**

In 2005, CMS issued a Notice of Proposed Rulemaking regarding these audit and reporting requirements. *See* Disproportionate Share Hospital Payments, 70 Fed. Reg. 50,262 (proposed Aug. 26, 2005). A Final Rule was issued on December 19, 2008 ("the Rule"). *See* Disproportionate Share Hospital Payments, 73 Fed. Reg. 77,904 (Dec. 19, 2008). The Rule requires that the states annually submit information "for each DSH hospital to which the State made a DSH payment." 42 C.F.R. § 447.299(c). One such piece of information is the hospital's "total annual uncompensated care costs," which the Rule defined as an enumerated set of "costs" minus an enumerated set of "payments":

> The total annual uncompensated care cost equals the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of regular Medicaid [fee-for-service] rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1011 payments.

*Id.* § 447.299(c)(16). The regulation specifically defined each type of cost and payment.[1]

---

[1] *See id.* § 447.299(c)(10) (Total Costs for Medicaid Services: "The total annual costs incurred . . . for furnishing . . .

To ease the transition to the new audit and reporting regime, CMS provided for a six-year transition, to avoid subjecting any state to "immediate penalt[ies] that would result in the loss of Federal matching dollars." 73 Fed. Reg. at 77,906. Accordingly, any audits "from Medicaid State plan rate year 2005 through 2010" would be "used only for the purpose of determining prospective hospital-specific cost limits and the actual DSH payments associated with a particular year." *Id.* For 2011 payments, the audit of which must be completed by December 31, 2014, Simon Decl., ECF No. 3-8 ¶ 18, and all subsequent years, DSH overpayments must be recovered by the state and returned to the federal government, unless they "are redistributed by the State to other qualifying hospitals." 73 Fed. Reg. at 77,906.

## C.   FAQ Number 33

On January 10, 2010, CMS posted answers to "frequently asked questions" regarding the audit and reporting requirements. *See* Additional Information on the DSH Reporting and Auditing Requirement, http://www.medicaid.gov/Medicaid-CHIP-Program-

---

services to Medicaid eligible individuals"); *id.* § 447.299(c)(14) (Total Costs for Uninsured Individuals: "[T]he total costs incurred for furnishing . . . services to individuals with no source of third party coverage"); *id.* §§ 447.299(c)(6)–(8) (defining each Medicaid-related payment); *id.* § 447.299(c)(12) (Uninsured Revenues: "Total annual payments received . . . by or on behalf of individuals with no source of third party coverage"); *id.* § 447.299(c)(13) (Section 1011 Payments: "[P]ayments for . . . services provided to Section 1011 eligible aliens with no source of third party coverage").

Information/By-Topics/Financing-and-Reimbursement/Downloads/

AdditionalInformationontheDSHReporting.pdf (last visited Dec.

29, 2014). Question Number 33 forms the crux of this case:

> 33. Would days, costs, and revenues associated with
> patients that have both Medicaid and private insurance
> coverage (such as Blue Cross) also be included in the
> calculation of the . . . DSH limit in the same way
> States include days, costs and revenues associated
> with individuals dually eligible for Medicaid and
> Medicare?
>
> Days, cost[s], and revenues associated with patients
> that are dually eligible for Medicaid and private
> insurance should be included in the calculation of the
> Medicaid inpatient utilization rate (MIUR) for the
> purposes of determining a hospital eligible to receive
> DSH payments. Section 1923(g)(1) does not contain an
> exclusion for individuals eligible for Medicaid and
> also enrolled in private health insurance. *Therefore,*
> *days, costs, and revenues associated with patients*
> *that are eligible for Medicaid and also have private*
> *insurance should be included in the calculation of the*
> *hospital-specific DSH limit.*

*Id.* at 18 (emphasis added).

### D. Factual Background

#### 1. *Seattle Children's*

On June 15, 2011, the Washington State Health Care Authority

informed Seattle Children's that the agency "would be revising

its [hospital-specific limit] calculation for the . . . 2012

Medicaid DSH application." Kinzig Decl., ECF No. 3-14 ¶ 14. The

Authority stated that recent audits revealed that "some

hospitals were not reporting all charges and payments received

for providing care to Medicaid-eligible patients" and therefore

mandated that "in the case that a Medicaid-eligible patient has insurance or other third-party coverage, these charges and payments should be included in the DSH cap calculation." *Id.* Seattle Children's submitted its 2012 DSH application in July 2011, but the new calculation rendered its hospital-specific limit negative, making it ineligible for DSH payments. *See id.* ¶ 16. Seattle Children's was also "advised . . . that if the audit process . . . determined that the hospital was paid more than its DSH cap . . . the state would force the hospital to pay back to the state any identified overpayment." *Id.* ¶ 18.

Seattle Children's hired a consultant "to identify why [the Washington State Health Care Authority] was using a new calculation"; "[t]he consultant determined that [the] new calculation was drawn from . . . FAQ No. 33." *Id.* ¶ 19. Seattle Children's sent multiple letters to the state agency in October and November of 2011 describing this impact. *See id.* ¶ 24. The agency responded, and "has consistently advised in . . . communications and, finally, in a meeting held . . . on July 23, 2014, . . . that it would follow CMS instructions and, therefore would have to recoup Medicaid DSH payments in excess of a [hospital-specific limit]." *Id.* ¶ 25.

Seattle Children's has also "lodged multiple appeals with [the Washington State Health Care Authority]," since 2012, all to no avail. *See id.* ¶ 26. "In each instance in which [Seattle

Children's] sought relief from the application of FAQ No. 33, [the State] denied [those] appeals." *Id.* In 2012, 2013, and 2014, moreover, the Washington State Health Care Authority denied Seattle Children's application for any DSH payments. *See id.* ¶¶ 27–29. On July 23, 2014, however, Seattle Children's met with the Washington State agency, which agreed to support Seattle Children's efforts to lobby CMS to modify FAQ 33. *See* Harris Decl., ECF No. 16-1 ¶ 29.

In September 2014, Seattle Children's received a preliminary report on the audit of its 2011 DSH payments. *See* Kinzig Decl., ECF No. 3-14 ¶ 31. That audit "retrospectively calculated Seattle Children's 2011 [hospital-specific limit] to be negative." *Id.* "As such, the auditors found that all of the $7,060,567 in 2011 DSH funds . . . exceeded Seattle Children's 2011 adjusted [hospital-specific limit]." *Id.* The Washington State Health Care Authority, moreover, "has consistently warned that it has the power to recoup any DSH payments in excess of a [hospital-specific limit]," and to redistribute those funds to other DSHs. *Id.* ¶ 32. The Washington State Health Care Authority is in the process of promulgating rules regarding the recoupment and distribution process, but the proposed rules "do not offer an administrative process" for reversing a recoupment or recovering payments that have been redistributed. *See id.* ¶ 33.

*2.   Texas Children's*

In December 2010, Texas Children's learned that its 2011 hospital-specific limit "was being calculated at approximately $8 million less than . . . expected." Simon Decl., ECF No. 3-8 ¶ 23. It did not then know about FAQ 33. *See id.* In March 2012, Texas Children's learned that its 2012 hospital-specific limit would be significantly lower than expected, due to three "calculation errors" and a "$12 million reduction . . . resulting from [the Texas Health and Human Services Commission's] use of third-party insurance payments to offset Medicaid-allowable costs." *Id.* ¶ 24. The Texas Health and Human Services Commission ("the Commission") ultimately corrected the calculation errors, "but rejected Texas Children's appeal of the third-party-payment offset." *Id.* In reviewing this issue in 2012, Texas Children's learned that the same issue was the cause of its lower-than-expected 2011 DSH payment. *See id.* ¶ 25.

Texas Children's contacted the Commission in an attempt to resolve this issue. *See* Harris Decl., ECF No. 16-1 ¶ 3. Texas Children's met with the Commission, which subsequently "agreed in an October 2012 letter to work with Texas Children's in seeking a clarification from [CMS] regarding the DSH [hospital-specific limit] calculation issues." *Id.* ¶ 4; *see also id.* ¶ 5. A December 14, 2012 letter from the Commission to CMS also supported Texas Children's: "[T]he children's hospitals have

identified a legitimate issue of federal law and policy that would benefit from a clarification by CMS." Ex. A-2 to Pls.' Reply, ECF No. 15-3 at 4.

Texas Children's wrote to CMS in November 2012 to request "a face-to-face meeting to discuss FAQ No. 33." Harris Decl., ECF No. 16-1 ¶ 6. A meeting was held on December 18, 2012 with CMS at which representatives of Seattle Children's and Texas Children's "set forth the issues and the specific manner in which the FAQ approach was incorrect and inconsistent with the statute and regulations." *Id.* ¶ 9. "CMS agreed to consider the proposed options and respond." *Id.*

In March 2013, believing it was bound by FAQ 33, the Commission proposed new regulations that would have "incorporated a calculation methodology similar to the FAQ No. 33 methodology." *Id.* ¶ 11. Texas Children's then "turned its attention to challenging the adoption of the new state rules." *Id.* This challenge was complicated when, on May 26, 2013, the Texas State Legislature adopted a change to state law that declared that the calculation of hospital-specific limits would not include private-insurance payments for Medicaid-eligible patients. *See* S.B. 7, 83d Leg., Reg. Sess. (Tex. 2013). Despite this change, Texas continued to operate under a state Medicaid plan that it viewed as incorporating FAQ 33's calculation. *See* Harris Decl., ECF No. 16-1 ¶ 20.

Texas Children's accordingly continued to lobby CMS. In April 2013, CMS wrote Texas Children's regarding the issue:

> The 2008 final rule and the [FAQ Document] . . . clarified how costs and revenues associated with individuals dually eligible for Medicaid and Medicare and individuals who are eligible for Medicaid and have private insurance coverage must be treated when calculating Medicaid hospital-specific DSH limits.

Letter from Kristin Fan, Acting Director, Financial Management Group, CMS, to Susan Feigin Harris, Counsel for Texas Children's (Apr. 17, 2013), ECF No. 15-5 at 1. The letter nonetheless indicated that CMS was "open to meeting to discuss this information and our interpretation in greater depth" and that "[w]e are continuing to review DSH policies as a result of the audits and in anticipation of further DSH revisions included in the Affordable Care Act." *Id.* at 1, 2.

Texas Children's and Seattle Children's next began to lobby their congressional representatives. *See* Harris Decl., ECF No. 16-1 ¶ 15. This resulted in a series of meetings on Capitol Hill, *id.* ¶ 16, and, on July 11, 2013, the Texas congressional delegation sent a letter to CMS stating that the FAQ 33 "interpretation . . . does not seem consistent with our understanding of how the DSH program should work." Letter from Texas Congressional Delegation, to Kathleen Sebelius, Secretary, U.S. Department of Health and Human Services (July 11, 2013), ECF No. 15-7 at 2.

At the same time, the Commission continued to support the efforts of Texas Children's. On April 22, 2013, the Commission sent an email to a representative of Texas Children's:

> [W]e'd be solidly behind an argument that supports the work of the children's hospitals and encourages CMS to take a broader view of the impact. I think we need to address the double payment myth.

Email from Steve Aragon, Chief Counsel, Texas Health and Human Services Commission, to Susan Feigin Harris, Counsel for Texas Children's (Apr. 22, 2013), ECF No. 15-6 at 1. Later that year, after meeting with CMS, the Commission's Executive Commissioner informed a representative for Texas Children's "that he understood that we may have to take more aggressive action and subsequently, sent . . . a text message indicating that [Texas Children's] should 'sue him.'" Harris Decl., ECF No. 16-1 ¶ 19.

On August 2, 2013, Texas Children's did just that, filing a lawsuit to enjoin Texas from applying the calculation codified by FAQ 33. *See id.* ¶ 20; *Tex. Children's Hosp. v. Tex. Health & Hum. Servs. Comm'n*, No. D-1-GN-13-002619 (200th Dist. Ct., Travis Cnty. filed Aug. 2, 2013). Texas Children's obtained a temporary injunction on November 15, 2013. Harris Decl., ECF No. 16-1 ¶ 20. On March 31, 2014, however, the state court "denied the hospital's request for declaratory judgment and permanent injunction," without a written opinion. *Id.* Texas Children's elected not to appeal because an appeal would neither "have

stayed the 2013 distribution," "allowed later recovery of those losses as damages, [n]or had any binding effect on CMS." *Id.*

While that lawsuit was still ongoing, the Commission proposed to CMS an amendment to the Texas Medicaid Plan that would have revised the calculation to reflect the law passed by the state legislature. *See id.* ¶ 22. In February 2014, CMS requested additional information regarding the proposal, and Texas Children's participated in this process by submitting comments on the Commission's proposed response. *See id.* ¶ 23. CMS did not act until July 14, 2014, when it denied the proposed amendment. *See id.* ¶ 24. In denying the proposal, CMS relied at least in part on FAQ 33, which CMS noted "'clarified' that 'all third party payer revenues received by the hospital on behalf of [individuals eligible for Medicaid with a source of private insurance coverage] must be included in the calculation of the hospital-specific DSH limit.'" Compl. ¶ 55; *see also* Harris Decl., ECF No 16-1 ¶ 24. Texas had sixty days from the July 14, 2014 decision to appeal, but declined to do so "[d]espite Texas Children's' urging." Harris Decl., ECF No. 16-1 ¶ 24.

At this point, Texas Children's returned to its Congressional delegation to "test CMS's prior expressions of willingness to further consider its position with respect to FAQ No. 33." *Id.* ¶ 25. A meeting took place on August 29, 2014, between representatives of Seattle Children's, Texas Children's, and

CMS, but "CMS refused to change its position." *Id.* ¶ 26.

Meanwhile, the audit of fiscal-year 2011 DSH payments was ongoing. *See id.* ¶ 27. Texas Children's did not receive its preliminary audit report until October 7, 2014. *See* Simon Decl., ECF No. 3-8 ¶ 28. The preliminary report indicated that Texas Children's would have its hospital-specific limit reduced to a negative number. *See id.* On October 20, 2014, Texas Children's learned of the Commission's determination that the entirety of its 2011 DSH payment—$21,707,266—was an overpayment. *See id.* The Commission's notice indicates that it "'will recoup any overpayment of DSH funds' that is identified in the state's final 2011 audit report to CMS." *Id.; see also* Ex. 2-B to Simon Decl., ECF No. 3-10 at 1. On November 19, 2014, Texas Children's appealed that finding, but its appeal was denied on November 24, 2014. *See* Simon Decl., ECF No. 3-8 ¶ 30.

### E.   Procedural History

Plaintiffs filed this lawsuit on December 5, 2014. That same day, they filed a motion for a preliminary injunction, which requests that the Court enjoin the defendants from enforcing or applying FAQ 33, and that the Court direct the defendants to send a letter to the state agencies in Texas and Washington notifying them that the Court has enjoined FAQ 33. *See* Mem. in Supp. of Mot. for Prelim. Inj. ("Mot."), ECF No. 3-1. The defendants filed their opposition on December 12, 2014. *See*

Gov't's Opp. to Mot. for Prelim. Inj. ("Opp."), ECF No. 14. The
plaintiffs filed their reply brief on December 15, 2014. *See*
Pls.' Reply ("Reply"), ECF No. 15. In light of plaintiffs'
inclusion of additional exhibits with their reply brief, the
Court directed the government to file a surreply, which was
filed on December 19, 2014. *See* Gov't's Surreply ("Surreply"),
ECF No. 17. The motion is ripe for the Court's consideration.

## II.  Standard of Review

A plaintiff seeking a preliminary injunction must establish
"(1) a substantial likelihood of success on the merits, (2) that
it would suffer irreparable injury if the injunction were not
granted, (3) that an injunction would not substantially injure
other interested parties, and (4) that the public interest would
be furthered by the injunction." *Chaplaincy of Full Gospel
Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "The
purpose of a preliminary injunction is merely to preserve the
relative positions of the parties until a trial on the merits
can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395
(1981). It is "an extraordinary and drastic remedy" and "should
not be granted unless the movant, by a clear showing, carries
the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968,
972 (1997) (emphasis omitted). In this Circuit, the four factors
have typically been evaluated on a "sliding scale," such that if
"the movant makes an unusually strong showing on one of the

factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), "the D.C. Circuit has suggested that a positive showing on all four preliminary injunction factors may be required." *Holmes v. FEC*, No. 14-1243, 2014 WL 5316216, at *3 n.4 (D.D.C. Oct. 20, 2014); *see also Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.") (quotation marks omitted). Nonetheless, "the Circuit has had no occasion to decide this question because it has not yet encountered a post-*Winter* case where a preliminary injunction motion survived the less rigorous sliding-scale analysis." *ConverDyn v. Moniz*, No. 14-1012, 2014 WL 4477555, at *8 n.2 (D.D.C. Sept. 12, 2014).

**III. Analysis**

**A.   Plaintiffs Are Likely to Succeed on the Merits.**

Plaintiffs argue that FAQ 33 was promulgated in violation of the Administrative Procedure Act and that it is contrary to the Medicaid Act. The defendants dispute this and also assert that plaintiffs are unlikely to succeed on the merits because they lack standing. Underlying these arguments is a more fundamental

disagreement about the nature of this case: The parties agree that the defendants have a policy of requiring the inclusion of private-insurance payments for Medicaid services in the calculation of a hospital-specific limit, but they disagree on the legal basis for that policy. Plaintiffs assert that neither the Medicaid Act nor the 2008 Rule provides a basis for the policy, so FAQ 33 must be its source. The defendants maintain that FAQ 33 is not the source of the policy, but it took some time for them to identify what *is* the source. During the December 8, 2014 status hearing, the government could not do so.[2] The government now contends that the 2008 Rule provides a legal basis for its policy. The Court must resolve this dispute before assessing the parties' legal arguments.

1.   *Plaintiffs Are Likely to Show that FAQ 33 Has Independent Effect.*

Defendants' policy is not codified by the Medicaid Act, which defines the hospital-specific limit as:

> [T]he costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for

---

[2] *See* Transcript of Dec. 8, 2014 Hearing, ECF No. 13 at 20:2–21:12. Defendants agreed that "[t]he agency's position is essentially that which is in FAQ 33." *Id.* at 20:16–17. They could not identify why, however, stating "[i]t may be that there are other documents that state that . . . principle which we believe to be longstanding." *Id.* at 20:23–25. When asked by the Court "[w]ell, what is the final agency action?" the government had no answer. *See id.* at 21:10–12.

> medical assistance under the State plan or have no
> health insurance (or other source of third party
> coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A). The Act does not include private-

insurance payments among those that are specifically enumerated

as offsets. Only Medicaid payments—those "under this

subchapter"—are mentioned. *See id.* At most, the statute might

have delegated to the Secretary the ability to determine by

regulation that additional payments should be considered.

Even if the Secretary had such discretion, she did not

exercise it in the 2008 Rule. Although defendants claim that the

Rule supports them, they largely ignore its text in favor of

selected portions of its Preamble. The government is correct

that the Preamble states that the "costs" to be considered in

calculating the hospital-specific limit are "the unreimbursed

costs of providing . . . services to Medicaid eligible

individuals and the unreimbursed costs of providing . . .

services to individuals with no source of third party

reimbursement." 73 Fed. Reg. at 77,920; *see also id.* at 77,914.

According to the government, the term "unreimbursed costs" means

that costs included in calculating the hospital-specific limit

must be only those for which no reimbursement is received from

any source. As a plain-meaning reading of the phrase, this

argument may have some appeal. The phrase, however, cannot be

divorced from its context—which includes a specific definition

of the calculation and all relevant inputs. *See Colautti v. Franklin*, 439 U.S. 379, 392 n.10 (1979) ("a definition which declares what a term means . . . excludes any meaning that is not stated") (quotation marks omitted); *Fla. Dep't of Banking & Fin. v. Bd. of Governors of Fed. Reserve Sys.*, 800 F.2d 1534, 1536 (11th Cir. 1986) ("It is an elementary precept of statutory construction that the definition of a term in the definitional section of a statute controls the construction of that term wherever it appears throughout the statute."). It is this context that renders the defendants' argument untenable.

First, the statements in the Preamble cited by the government are not representative. The Preamble also stated on multiple occasions that the Rule did not effect any change in the calculation of the hospital-specific limit. *See* 73 Fed. Reg. at 77,921 ("[W]e disagree that this rule changes the definition of uncompensated care that is counted in calculating the hospital-specific DSH limit."); *id.* at 77,906 ("This regulation does not alter any of the substantive standards regarding the calculation of hospital costs."). Despite this language, the defendants have identified the Rule as implementing a new method of calculating the hospital-specific limit.

Second, a preamble does not create law; that is what a regulation's text is for. The actual regulatory text included a step-by-step guide to calculating the "unreimbursed costs,"

including specific definitions of what makes up the "cost" side
of the equation and what makes up the "payment" side. To the
extent that this definition is contradicted by the Rule's
Preamble, the definition controls. *See Barrick Goldstrike Mines,
Inc. v. Whitman*, 260 F. Supp. 2d 28, 36 (D.D.C. 2003) (when "the
preamble to [a] rulemaking is inconsistent with the plain
language of the regulation, it is invalid") (citation omitted);
*Nat'l Wildlife Fed. v. EPA*, 286 F.3d 554, 569–70 (D.C. Cir.
2002) ("The preamble to a rule is not more binding than a
preamble to a statute. 'A preamble no doubt contributes to a
general understanding of a statute, but it is not an operative
part of the statute and it does not enlarge or confer powers on
administrative agencies or officers.'") (quoting *Ass'n of Am.
R.Rs. v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1977)).

The formula codified by the Rule did not contemplate the
inclusion of private-insurance payments for Medicaid-eligible
services. It defined "total annual uncompensated care costs" as:

> [T]he total cost of care for furnishing inpatient
> hospital and outpatient hospital services to Medicaid
> eligible individuals and to individuals with no source
> of third party coverage for the hospital services they
> receive less the sum of regular Medicaid [fee-for-
> service] rate payments, Medicaid managed care
> organization payments, supplemental/enhanced Medicaid
> payments, uninsured revenues, and Section 1011
> payments.

*See* 42 C.F.R. § 447.299(c)(16). These components are further defined, making no mention of payments from private insurance for Medicaid-eligible patients. *See id.* §§ 447.299(c)(6)–(15).

Defendants offer no convincing interpretation of this regulation. They argue that the regulation's definition of "costs" from which various Medicaid payments are later subtracted should be read to mean "unreimbursed costs." Surreply at 12. But the regulation defines the cost-side of the equation and does not limit it to costs that are "unreimbursed" or "uncompensated." 42 C.F.R. § 447.299(c)(10). This is sensible, as the regulation separately describes the various payments that are subtracted from the "costs" to obtain the "annual uncompensated costs." *See id.* §§ 447.299(c)(6)–(9). Defendants' reading would appear to double count Medicaid-related payments (first as "reimbursements" to be subtracted to arrive at the "cost" figure, then again as payments specifically enumerated in the regulation as being subtracted from the overall cost figure to obtain the "unreimbursed costs"). Accordingly, plaintiffs are likely to succeed in arguing that the Rule cannot support defendants' policy and that FAQ 33 is the sole authority for it.[3]

---

[3] To be sure, the Court must "give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S 504, 512 (1994). The government, however, has offered a "plainly erroneous interpretation," *id.*, which ignores a specific definition

> 2.  *Plaintiffs Likely Have Standing to Challenge these Defendants' Enforcement of FAQ 33.*

Having found that FAQ 33 has independent legal effect, the Court addresses defendants' argument that plaintiffs are unlikely to succeed on the merits because they lack standing. To establish Article III standing, plaintiffs "'must establish that (1) [they] suffered an injury-in-fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury will likely be redressed by a favorable decision.'" *Associated Builders & Contractors, Inc. v. Shiu*, No. 13-1806, 2014 WL 1100779, at *4 (D.D.C. Mar. 21, 2014) (quoting *In re Polar Bear Endangered Species Act Listing,* 627 F. Supp. 2d 16, 24 (D.D.C. 2009)). The redressability prong of this test asks "whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Food & Water Watch v. EPA*, 5 F. Supp. 3d 62, 78 (D.D.C. 2013). "[E]ven at the pleading stage, [plaintiffs] must make factual allegations showing that the relief [they] seek[] will be likely to redress [their] injury." *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1276 (D.C. Cir. 2007). Defendants make two standing arguments, both of which challenge plaintiffs' ability to obtain redress from this Court.

---

provided by the regulation, and relies solely on creative readings of certain portions of the Rule's Preamble.

Defendants' first argument is that the Court cannot redress plaintiffs' injuries because FAQ 33 has no legal effect. *See* Opp. at 22–23. As discussed above, this is incorrect. *See supra* Part III.A.1. A Court order enjoining the enforcement of FAQ 33 would "likely alleviate the particularized injury alleged by [plaintiffs]." *Food & Water Watch*, 5 F. Supp. 3d at 78.

Defendants' second argument is that plaintiffs' injury is caused by the pending recoupment by state Medicaid agencies, neither of which are parties to this case, making it impossible for the Court to grant relief. *See* Opp. at 23–24. Defendants argue that any injunction against the enforcement of FAQ 33 by CMS "would have no effect on either the states' obligation to comply with the December 2008 final rule or the states' efforts to recoup any excess DSH payments from plaintiffs." *Id*. at 24. For one, the Rule has no bearing on this issue. *See supra* Part III.A.1. As for the effect an injunction against CMS's enforcement of FAQ 33 would have, the relationship between CMS and the state agencies is not as independent as defendants aver.

"When the suit is one challenging the legality of government action or inaction . . . [and] a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of someone else . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit

redressability of injury." *Lujan v. Defenders of Wildlife*, 504
U.S. 555, 561–62 (1992) (emphasis omitted); *see also Simon v. E.
Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). In such
circumstances, "mere unadorned speculation as to the existence
of a relationship between the challenged government action and
the third-party conduct will not suffice to invoke the federal
judicial power." *Nat'l Wrestling Coaches Ass'n v. Dep't of
Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quotation marks
omitted). Standing may be established "on the basis of injuries
caused by regulated third parties where the record present[s]
substantial evidence of a causal relationship between the
government policy and the third-party conduct, leaving little
doubt as to causation and the likelihood of redress." *Id.* at
941. To show this, the D.C. Circuit "ha[s] required only a
showing that the agency action is at least a substantial factor
motivating the third parties' actions." *Tozzi v. U.S. Dep't of
Health & Hum. Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001)
(quotation marks omitted).

   The recoupment decisions of the state Medicaid agencies are
inextricably intertwined with the defendants' enforcement of FAQ
33. Medicaid is "a cooperative venture between the federal and
state governments," *Johnson*, 609 F. Supp. 2d at 2, aligning the
state Medicaid agencies with the defendants. The defendants
enjoy significant authority over this venture: they can reject

state plans that do not comport with their view of Medicaid's
requirements (as they did for Texas's state plan which sought to
avoid FAQ 33), and may revoke federal financial participation.
*See* 42 U.S.C. §§ 1316(a), (c)-(e), 1396a, 1396b. Against this
backdrop, FAQ 33 functions to require the states to include
private-insurance payments for Medicaid-eligible services in
calculating a hospital-specific limit. At a minimum, this makes
defendants' enforcement of FAQ 33 "a substantial factor
motivating the third parties' actions." *Tozzi*, 271 F.3d at 308.

Not only is FAQ 33 enforced against the state agencies, the
state agencies have also indicated their support for plaintiffs'
position; they follow CMS's lead only because they have to. *See*
Harris Decl., ECF No. 16-1 ¶¶ 4-5, 19, 22-24, 29; Ex. A-2 to
Pls.' Reply, ECF No. 15-3 at 4; Email from Steve Aragon, Chief
Counsel, Texas Health and Human Services Commission, to Susan
Feigin Harris, Counsel for Texas Children's (Apr. 22, 2013), ECF
No. 15-6 at 1. FAQ 33 is the only thing standing between the
plaintiffs and redress of their injuries; in other words, the
state agencies' actions are "not made substantially independent
of" the defendants' enforcement of FAQ 33. *Competitive Enterp.
Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 116
(D.C. Cir. 1990). For that reason, an injunction against the
defendants' enforcement of FAQ 33 would likely redress
plaintiffs' injuries.

> 3.   *Plaintiffs Are Likely to Show that FAQ 33 Violates the Administrative Procedure Act.*

Having found that FAQ 33 likely has independent legal effect and that plaintiffs are likely to have standing to challenge its enforcement, the Court turns to plaintiffs' argument that FAQ 33 violates the Administrative Procedure Act. Two interrelated issues arise. First, whether FAQ 33 is "final agency action" that may be challenged under 5 U.S.C. § 704. Second, whether FAQ 33 is subject to the notice-and-comment requirements of 5 U.S.C. § 553, which are triggered unless the agency has promulgated "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."

Final agency action arises upon satisfaction of two conditions:

> First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks and citations omitted). Thus, a rule that has no legal effect independent of the source it purports to interpret is not final agency action. *See, e.g.*, *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013). The defendants argue that FAQ 33 is not final agency action because "CMS's interpretation is

embodied in the 2008 final rule. As such, FAQ 33 changes
nothing." Opp. at 25.

Relatedly, an agency pronouncement requires "public notice and
comment" if it has "force and effect of law." *Nat'l Mining Ass'n
v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quotation marks
omitted). Notice and comment is not required for "[a]n agency
action that merely interprets a prior statute or regulation, and
does not itself purport to impose new obligations or
prohibitions or requirements on regulated parties." *Id.* at 252;
*see also Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014)
("The court's inquiry in distinguishing legislative rules from
interpretative rules is whether the new rule effects a
substantive regulatory change to the statutory or regulatory
regime.") (quotation marks omitted). An interpretive rule is one
that "derive[s] a proposition from an existing document whose
meaning compels or logically justifies the proposition."
*Mendoza*, 754 F.3d at 1021 (quotation marks omitted). The
defendants make essentially the same argument here—"FAQ 33
merely explains how the Secretary's existing December 2008 rule
applies . . . and FAQ 33 does not modify or depart from that
earlier rule." Opp. at 26.

The arguments therefore overlap significantly: FAQ 33 is a
final agency action if it is one "by which rights or obligations
have been determined, or from which legal consequences will

flow," *Bennett*, 520 U.S. at 178 (quotation marks omitted), and it is subject to mandatory notice and comment if it has the "force and effect of law." *Nat'l Mining Ass'n*, 758 F.3d at 250. The Court addresses these related issues jointly.[4]

In determining whether FAQ 33 has legal effect sufficient to make it a final agency action that requires notice and comment, "[t]he most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Mining Ass'n*, 758 F.3d at 252; *see also Mendoza*, 754 F.3d at 1021 ("[a] rule is legislative if it . . . effects a substantive change in existing law or policy"). FAQ 33 modifies the formula for calculating the hospital-specific limit in a manner that is not provided for by any prior rule or statutory source. *See supra* Part III.A.1. Defendants argument that FAQ 33's addition of private-insurance payments for Medicaid services is a mere gloss on the Rule's use of the term "costs" is wholly unconvincing—that term was defined in the Rule in a manner that does not include private-insurance payments for Medicaid-eligible services. *See supra* at 23. This is not a situation where the challenged agency action "as a legal matter . . . is meaningless." *Nat'l Mining Ass'n*, 758 F.3d 252. Rather,

---

[4] Although there is an additional requirement for a finding of "final agency action"—that "the action . . . mark the consummation of the agency's decisionmaking process," *Bennett*, 520 U.S. at 178 (quotation marks omitted)—the defendants have not pressed that point.

FAQ 33 "effects a substantive change in existing law," which subjects it to notice-and-comment requirements, *Mendoza*, 754 F.3d at 1021; relatedly, it "alter[s] the legal regime to which the action agency is subject," which renders it "final agency action." *Bennett*, 520 U.S. at 178.

The change wrought by FAQ 33 is also binding on state Medicaid agencies, a factor that bolsters plaintiffs' argument. *See Natural Resources Defense Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) (EPA guidance that "binds EPA regional directors" constituted "final agency action"). Indeed, FAQ 33 has been cited as support for CMS actions, including its rejection of the proposed amendment to the Texas Medicaid plan. *See* Harris Decl., ECF No 16-1 ¶ 24. This, too, counsels in favor of finding that FAQ 33 has legal effect akin to a final legislative rule:

> If an agency acts as if a document issued at headquarters is controlling in the field, it if treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes "binding."

*Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000).

FAQ 33, moreover, effectively amends the 2008 Rule, which was a legislative rule. This weighs in favor of finding that FAQ 33 is also a legislative rule. *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) ("APA rulemaking would still be required if [the agency's Medicare reimbursement calculation] adopted a new position inconsistent with . . . existing regulations"); *Mendoza*, 754 F.3d at 1021 ("[a] rule is legislative if it . . . adopts a new position inconsistent with existing regulations"). This is intuitive: "[I]f a second rule repudiates or is irreconcilable with a prior legislative rule, the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) (quotation marks and alterations omitted).

Because FAQ 33 makes a substantive change to the formula for calculating a hospital's DSH limit, binds state Medicaid agencies, and effectively amends the 2008 Rule, it likely constitutes a final agency action that may be challenged pursuant to 5 U.S.C. § 704, and may only be promulgated in accordance with the notice-and-comment provisions of 5 U.S.C. § 553. There is no dispute that FAQ 33 was not subject to notice-

and-comment procedures, so plaintiffs are likely to succeed in arguing that FAQ 33 must be set aside as unlawful.[5]

**B.  Plaintiffs Face Irreparable Harm.**

"The failure to demonstrate irreparable harm is 'grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief.'" *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). "In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn*, 2014 WL 4477555, at *8 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The movant must demonstrate that it faces an injury that is "both certain and great; it must be actual and not theoretical," and of a nature "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and emphasis omitted).

Plaintiffs assert that the defendants' enforcement of FAQ 33 creates irreparable harm in three ways: (1) plaintiffs "imminently will be forced to repay millions of dollars in DSH

---

[5] Because plaintiffs are likely to argue successfully that there is no validly promulgated rule codifying the defendants' policy, the Court declines to reach the parties' competing *Chevron* arguments. Considerations of judicial economy and restraint counsel against deciding whether 42 U.S.C. § 1396r-4(g)(1)(A) could support a validly promulgated rule that codified the defendants' policy in the future.

funding . . . with no possible recourse to recover the DSH payments"; (2) plaintiffs are shut out of the DSH program entirely; and (3) plaintiffs must "reallocate even more resources from other sources to subsidize the actual losses they continue to incur in treating Medicaid patients." Mem. at 36-42.

"[I]n general, 'economic loss does not, in and of itself, constitute irreparable harm.'" *ConverDyn*, 2014 WL 4477555, at *9 (quoting *Wis. Gas. Co.*, 758 F.2d at 674). Economic losses may be sufficient where "the loss threatens the very existence of the movant's business." *Wis. Gas. Co.*, 758 F.2d at 674. Additionally, "if a movant seeking a preliminary injunction will be unable to sue to recover any monetary damages against a government agency in the future . . . financial loss can constitute irreparable injury." *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 52; *see also Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997). "[T]he fact that economic losses may be unrecoverable does not absolve the movant from its considerable burden of proving that those losses are certain, great and actual." *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 52 (quotation marks and emphases omitted). Ultimately, "[i]f a plaintiff has shown that financial losses are certain, imminent, and unrecoverable, then the imposition of a preliminary injunction is appropriate and necessary." *Id.* at 53.

Plaintiffs' injuries, while economic in nature, are "certain, imminent, and unrecoverable." *Id.* They are unrecoverable because neither Washington nor Texas has a procedure for recovering DSH funds once they have been recouped by the state. *See* Kinzig Decl., ECF No. 3-14 ¶¶ 32–34; Wallace Decl., ECF No. 3-17 ¶¶ 8, 11; Simon Decl., ECF No. 3-8 ¶¶ 32–33. Similarly unrecoverable economic loss has been found to be "more than sufficient, especially when considered with the other [preliminary-injunction] factors, to justify a [preliminary] injunction." *Brendsel v. Office of Fed. Hous. Enterprise Oversight*, 339 F. Supp. 2d 52, 67 (D.D.C. 2004); *see also Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) ("Because the Eleventh Amendment bars a legal remedy in damages, and . . . no adequate state administrative remedy existed . . . plaintiffs' injury was irreparable.").[6]

---

[6] Plaintiffs cite a number of decisions in support of their claim that they could not have sued the states in this Court due to the Eleventh Amendment. *See Springfield Hosp. v. Hoffman*, No. 9-cv-254, 2010 WL 3322716, at *6–7 (D. Vt. Apr. 9, 2010) (hospital's claim against a state for retrospective DSH payments and a corresponding declaratory judgment "is barred by the Eleventh Amendment"), *aff'd* 488 F. App'x 534, 534 (2d Cir. 2012); *cf. Davidson v. Howe*, 749 F.3d 21, 28 (1st Cir. 2014) ("states do not waive their Eleventh Amendment immunity merely be participating in the Medicaid program") (quotation marks and alteration omitted). Defendants responded with a cursory argument made in a footnote, stating that plaintiffs "ignore[] the many cases in which such rights of action have been found to exist." Surreply at 14 n.5. Defendants cited not a single authority in support of that proposition, and the Court declines to credit an unsupported, cursory argument made only in a

Plaintiffs' harms are "certain" because the state agencies must recoup the alleged overpayments within one year of discovering them, 42 C.F.R. § 433.312(a), or the federal government will recoup its share. 42 U.S.C. § 1316(a), (c)–(e). Indeed, the Texas Health and Human Services Commission has already informed Texas Children's that it "'will recoup any overpayment of DSH funds' that is identified in the state's final 2011 audit report to CMS." Simon Decl., ECF No. 3-8 ¶ 28; *see also* Ex. 2-B to Simon Decl., ECF No. 3-10 at 1. Washington's Medicaid agency has also indicated that "the state would force the hospital to pay back to the state any identified overpayment." Kinzig Decl., ECF No. 3-14 ¶ 18.

The harms are imminent because the final audit reports for the 2011 DSH payments are due on December 31, 2014, and as soon as they are submitted, complete recoupment may occur. Simon Decl., ECF No. 3-8 ¶¶ 18, 28. Defendants assert that this *potential* that the states could wait until September 2015 to recoup the funds counsels against a finding of imminence, Opp. at 16, but this misses the point: The states could move to recoup those funds immediately and irrevocably on January 1, 2015. *See Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (finding irreparable harm where "there is ample evidence

---

footnote. *See Jones v. Ottenberg's Bakers, Inc.*, 999 F. Supp. 2d 185, 188 n.3 (D.D.C. 2013) (citing *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999)).

of plaintiffs' imminent bankruptcy, absent the issuance of a preliminary injunction" in light of various liabilities including loans "due on demand," including some to individuals "who could demand payment at any time and . . . bring down the whole house of cards") (quotation marks omitted).

Plaintiffs, moreover, are not for-profit entities facing the loss of profit; rather, they are non-profits for whom lost funds would mean reducing hospital services to children, many of whom are Medicaid-eligible. The funds that Texas Children's stands to lose could:

> [P]ay the hospital's costs of: 52 heart or lung transplants and related hospital stays . . .; 61 liver transplants; 78 bone marrow transplants; 123 kidney transplants; 955 newborn C-section deliveries; hospital care for 1,052 low-weight newborns . . .; 32.6 percent of the pharmaceuticals purchased annually by Texas Children's; over 40 percent of Texas Children's' annual unfunded research operations; or the annual salaries and benefits for 192 full-time registered nurses.

Mem. at 38 (citing Simon Decl., ECF No. 3-8 ¶ 34). Similarly, the approximately $7,000,000 that Seattle Children's stands imminently to lose "can pay the hospital's costs of: 5 heart transplants and related inpatient stays; 25–30 liver transplants; 30–35 intestinal transplants; 50–55 kidney transplants; or 25–30 bone marrow transplants." *Id.* (citing Kinzig Decl., ECF No. 3-14 ¶ 22). This imminent loss is compounded by plaintiffs' effective exclusion from the DSH

program, which adds additional millions in lost funds annually.
Finally, the recoupment of the 2011 "overpayments" from
plaintiffs harms "other important services and programs funded
by Plaintiffs" by forcing them to reallocate resources to cover
even more of the costs of treating Medicaid patients. Mem. at
39; *see also* Simon Decl., ECF No. 3-8 ¶¶ 35-36. While this harm
would not drive plaintiffs out of business, it is different in
kind from economic loss suffered by a for-profit entity.[7]

Defendants' argument that "plaintiffs inexplicably waited
years to file this suit, thereby creating their own purported
emergency," Opp. at 12, is unconvincing. Excessive delay may
counsel against a finding of irreparable harm "[i]f the
plaintiff has failed to prosecute its claim for injunctive
relief promptly, and if it has no reasonable explanation for its
delay." *NRDC v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998); *see
also Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An
unexcused delay in seeking extraordinary injunctive relief may
be grounds for denial because such delay implies a lack of

---

[7] Defendants argument that "monetary loss constitutes irreparable
harm only where the loss threatens the very existence of the
[movant's] business," Opp. at 17, misses the point—plaintiffs
may not be driven out of business, but programs they provide may
be. Moreover, the case cited by the defendants in support of
this argument, *Bill Barrett Corp. v. United States Department of
Interior*, 601 F. Supp. 2d 331 (D.D.C. 2009), relied on the fact
that the evidence was "at best, inconclusive as to whether [the
harm plaintiff sought to avoid] is likely to occur" and the
plaintiff "ha[d] not established that corrective or compensatory
relief is otherwise unavailable." *Id.* at 335, 336.

urgency and irreparable harm."). Plaintiffs, however, have explained why they filed suit when they did.

Plaintiffs did not become aware of the policy until June 2011 (Seattle Children's) and March 2012 (Texas Children's). *See* Kinzig Decl., ECF No. 3-14 ¶ 14; Simon Decl., ECF No. 3-8 ¶ 24.[8] In light of the nontraditional nature of FAQ 33—an answer to a frequently-asked question posted on an agency website—plaintiffs reasonably pursued non-litigation avenues first. They lobbied CMS to make clear that FAQ 33 was the sole source for the new calculation and therefore an unlawful regulation, protested with their state Medicaid agencies, and pressed the issue with sympathetic members of Congress. *See supra* at 9–13, 15.

Texas Children's engaged in further steps, suing its state Medicaid agency, which found itself bound by CMS's guidance, and pressing the state to amend its Medicaid plan to avoid FAQ 33. *See supra* at 14–15. Texas Children's had not exhausted these options until mid-September 2014, when the state decided—over Texas Children's' objections—not to appeal CMS's rejection of its proposed amendment. *See* Harris Decl., ECF No. 16-1 ¶ 24.

Meanwhile, neither hospital received the results of the audit of 2011 payments—the first audit that triggers recoupment—until

---

[8] Defendants assert that plaintiffs should have been aware of the injury they seek to remedy on December 19, 2008, when the Rule was promulgated. *See* Opp. at 13. This is irrelevant because the Rule did not codify the policy. *See supra* Part III.A.1.

the fall of 2014. In Seattle Children's' case, they learned of
the result on September 19, 2014, Kinzig Decl., ECF No. 3-14 ¶
31, Texas Children's learned that its protest of the preliminary
audit result had been unsuccessful on November 24, 2014. *See*
Simon Decl., ECF No. 3-8 ¶ 30. This case was filed soon after,
on December 5, 2014.

   In light of plaintiffs' diligent pursuit of a variety of
avenues for reversing a policy that now appears to have been
based solely on an answer to a frequently-asked question posted
on an agency's website, plaintiffs' "delay" does not give rise
to an inference that the harm is not irreparable and imminent.
*See, e.g., Kan. Health Care Ass'n*, 31 F.3d at 1544 ("Within
three months of having failed to reach such a settlement
[regarding Medicaid payments] plaintiffs commenced this action.
Under those circumstances, we are reluctant to hold that
plaintiffs' delay should be fatal to their claim of irreparable
injury.").[9] Even if plaintiffs had waited rather than pursuing a

---

[9] The decisions cited by defendants involved extensive delay,
unexplained delay, or delay that rendered the dispute moot. *See,
e.g., Indep. Bankers Ass'n v. Heimann*, 627 F.2d 486, 488 (D.C.
Cir. 1980) (weighing against a finding of irreparable harm the
fact that the plaintiff "waited twelve years before commencing
this action," even though it had standing to do so years
earlier, when its members began to experience the allegedly
unlawful effects of the regulation); *Fund for Animals v.
Frizzell*, 530 F.2d 982, 987-88 (D.C. Cir. 1975) (denying request
for a preliminary injunction in part due to "the delay of the
appellants in seeking one" where "they delayed bring any action
until 44 days [after their injury arose]" and "an injunction

variety of remedies, the totality of the harm would not
necessarily have been immediately apparent. "[T]ardiness is not
particularly probative in the context of ongoing, worsening
injuries" because "the magnitude of the potential harm becomes
apparent gradually, undermining any inference that the plaintiff
was sleeping on its rights." *Arc of Cal. v. Douglas*, 757 F.3d
975, 990 (9th Cir. 2014) (quotation marks omitted); *id.* at 991
(where "the harm alleged . . . related in part to the continued
economic viability of service providers in the face of cuts in
compensation," the impact may take time to "become irreparable,"
so "waiting to file for preliminary relief until a credible case
for irreparable harm can be made is prudent rather than
dilatory"); *see also Kan. Health Care Ass'n*, 31 F.3d at 1544
(courts are "reluctant to criticize plaintiffs for awaiting
specific and concrete documentation of the adequacy of their
Medicaid reimbursement rates [because] [w]ithout such
documentation, they run the risk of having their claimed injury
be deemed speculative"). Accordingly, the harm the plaintiffs
face is irreparable.

---

would be all but futile at this time, . . . [where the harm] was
admitted to be 'pretty well over' on the day the case was argued
in this court"); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d
30, 44 (D.D.C. 2000) (claim by generic-drug maker that it
suffered irreparable harm due to its product being kept off the
market was undermined by eight-month delay; "[t]hough such a
delay is not dispositive of the issue, it further militates
against a finding of irreparable harm").

### C.   The Balance of Equities Favors an Injunction.

The balance-of-equities factor directs the Court to "'balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief.'" *ConverDyn*, 2014 WL 4477555, at *12 (D.D.C. Sept. 12, 2014) (quoting *Winter*, 555 U.S. at 24). "When the issuance of a preliminary injunction, while preventing harm to one party, causes injury to the other, this factor does not weigh in favor of granting preliminary injunctive relief." *Id.; see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). By contrast, the balance of equities may favor a preliminary injunction that serves only "'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Rufer v. FEC*, No. 14-837, 2014 WL 4076053, at *7 (D.D.C. Aug. 19, 2014) (quoting *Camenisch*, 451 U.S. at 395).

Plaintiffs largely seek to preserve the status quo. Absent an injunction, the 2011 DSH payments they already received will be subject to immediate and irrevocable recoupment by their respective state Medicaid agencies. *See supra* at 36. The corollary to plaintiffs' argument is that the issuance of a preliminary injunction may mean that the plaintiffs would retain funds that would otherwise have been recovered by the government or distributed to other DSHs. Defendants, however, did not argue that this poses the same imminent and irrevocable risk. Indeed,

the deadline for the states to recoup the 2011 DSH overpayments is one year from the discovery of any overpayment—approximately September 2015. *See* 42 C.F.R. § 433.312(a). Moreover, if the state-recoupment period lapsed, the federal government would still have the right to "adjust[] . . . the Federal payment to [the] State on account of such overpayment." 42 U.S.C. § 1396b(d)(2)(C). It is thus not the case that "the alleged irreparable economic injury suffered by the Plaintiffs would be offset by the corresponding economic injury to the Secretary." *Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 69 (D.D.C. 2010). The balance of equities therefore favors an injunction.

**D.   The Public Interest Weighs in Favor of an Injunction.**

Courts have frequently found that it is in the public interest to issue an injunction in connection with the Medicaid Act. *See e.g.*, *Edmonds v. Levine*, 417 F. Supp. 2d 1323, 1342 (S.D. Fla. 2006) ("Issuance of an injunction to enforce the federal Medicaid Act is without question in the public interest"); *Children's Mem'l Hosp. v. Ill. Dep't of Pub. Aid*, 562 F. Supp. 165, 174 (N.D. Ill. 1983) (the public interest was served by issuing a preliminary injunction to prohibit the implementation of Medicaid "in a way that conflicts with the national public interest as articulated in [the Medicaid Act and accompanying regulations]"). Where, as here, the plaintiffs are hospitals that disproportionately serve Medicaid-eligible patients, it is

important to keep in mind that "there is a robust public interest in safeguarding access to health care for those eligible for Medicaid, whom Congress has recognized as 'the most needy in the country.'" *Indep. Living Ctr. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009) (quoting *Schweiker v. Hogan*, 457 U.S. 569, 590 (1982)), *vacated on other grounds by Douglas Indep. Living Ctr.*, 132 S. Ct. 1204 (2012). Further, as courts have held in the context of Medicare-reimbursement cases, "the Secretary's compliance with applicable law constitutes a separate, compelling public interest." *In re Medicare Reimbursement Litig.*, 309 F. Supp. 2d 89, 99 (D.D.C. 2004); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA."). Accordingly, this factor weighs in favor of granting a preliminary injunction.

## IV.  Remedy

   Plaintiffs request a preliminary injunction with two components. First, they seek an injunction preventing defendants "from enforcing, applying, or implementing FAQ No. 33." Proposed Order, ECF No. 3-2 at 2. Second, they seek an order "that Defendants shall notify the Texas and Washington state Medicaid programs (in the form of the letter attached hereto) that, pending further order by the Court, the enforcement of FAQ No.

33 is enjoined and that Defendants will take no action to recoup any federal DSH funds provided to Texas and Washington based on a state's noncompliance with FAQ No. 33." *Id.* Defendants assert that the latter is an improper request because it seeks "a mandatory injunction that would compel defendants to affirmatively perform a discretionary act." Opp. at 18. It is true that the standard for obtaining an injunction is significantly heightened when a plaintiff requests affirmative injunctive relief. *See, e.g.*, *Bradshaw v. Veneman*, 338 F. Supp. 2d 139, 144 (D.D.C. 2004). Plaintiffs, however, ask only that the Court direct the defendants to inform their state partners—whose funding is contingent on compliance with the defendants' directives—of the injunction. By contrast, the plaintiffs in the cases cited by the defendants sought not only to maintain the status quo, but also to obtain affirmative relief that was different in kind, for example, the recovery of funds lost in the past—effectively a retrospective, compensatory remedy. *See id.*[10]

---

[10] *See also Bennett v. Donovan*, 703 F.3d 582, 588–89 (D.C. Cir. 2013) (noting that the court would not direct an agency on remand "to take a precise series of steps" with respect to plaintiffs' mortgage, including "accept[ing] assignment of the mortgage, pay[ing] off the balance . . . and then declin[ing] to foreclose"); *Palisades Gen. Hosp., Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (once the district court set aside as unlawful "the Secretary's decision rejecting the hospital's revised wage data," it had no "jurisdiction to order either reclassification based upon those adjusted wage data or an

The relief sought by the plaintiffs is in keeping with what the D.C. Circuit has suggested should flow from the finding that a legislative rule was promulgated without notice-and-comment: "The consequence is that the agency's previous practice . . . is reinstated and remains in effect unless and until it is replaced by a lawfully promulgated regulation." *Croplife Am. v. EPA*, 329 F.3d 876, 884–85 (D.C. Cir. 2003). Preventing the irreparable harm that plaintiffs face can be accomplished by ensuring that the states learn of the Court's injunction immediately.

**V.   Conclusion**

For the foregoing reasons, the Court **GRANTS** the plaintiffs' motion for a preliminary injunction. Any request to stay this decision pending appeal will be denied for substantially the same reasons as those articulated in this Opinion. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:**   **Emmet G. Sullivan**
**United States District Judge**
**December 29, 2014**

---

adjusted reimbursement payment that would reflect such a reclassification"); *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1011–12 (D.C. Cir. 1999) (district court erred when, after holding "that the Secretary had misinterpreted [part of the Medicare statute]," it "directed the Secretary to calculate the amount of . . . payments due to the Hospitals and to make payment accordingly").