# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Children's Health Care, doing business as Children's Hospitals and Clinics of Minnesota; and Gillette Children's Specialty Healthcare,

Plaintiffs,

v.

Centers for Medicare and Medicaid Services; Thomas Price, in his official capacity, Secretary, Department of Health and Human Services; and Patrick Conway, in his official capacity, Acting Administrator, Centers for Medicare and Medicaid Services,

Defendants.

Case No. 16-cv-4064 (WMW/DTS)

**ORDER**

---

This matter is before the Court on Plaintiffs' consolidated motion for summary judgment and injunctive relief, (Dkt. 34), and Defendants' cross-motion to dismiss or, in the alternative, for summary judgment, (Dkt. 43). Plaintiffs' second amended complaint alleges that Defendants promulgated an administrative rule in violation of the Administrative Procedures Act and that the challenged rule must, therefore, be vacated. Plaintiffs' motion seeks summary judgment as to both counts in their complaint, and Defendants' cross-motion seeks dismissal or judgment as a matter of law in their favor as to both counts. For the reasons addressed below, the Court grants Plaintiffs' motion in part and vacates the challenged rule, denies Plaintiffs' motion in part as moot, and denies Defendants' cross-motion.

## BACKGROUND

### I. Statutory and Regulatory Background

In 1965, Congress enacted the Medicaid Act, which established the Medicaid program as a cooperative venture between federal and state governments to assist states in providing medical care to eligible individuals. *See* 42 U.S.C. § 1396 *et seq.* Although states are not required to participate in the Medicaid program, states that choose to participate must comply with the Medicaid Act and regulations promulgated by the Secretary (Secretary) of the United States Department of Health and Human Services (HHS). *Id.* § 1396a; *see also Lankford v. Sherman*, 451 F.3d 496, 504 (8th Cir. 2006). To qualify for Medicaid funding, a state must adopt a Medicaid "plan" that is approved by the Center for Medicaid and Medicare Services (CMS), a subdivision of HHS. *See* 42 U.S.C. § 1396a. If CMS approves a state's plan, the federal government will reimburse the state for a portion of the state's Medicaid expenditures. *See id.* §§ 1396a, 1396b(a).

Congress amended the Medicaid Act in 1981 to take into account hospitals that "serve a disproportionate number of low-income patients with special needs." 42 U.S.C. § 1396a(a)(13)(A)(iv). Increased reimbursement funds were made available to hospitals that treat a disproportionate share of Medicaid-eligible and uninsured patients, and the statute refers to any such hospital as a "disproportionate share hospital" or "DSH." 42 U.S.C. § 1396r-4(b). The statute refers to these reimbursement funds as "DSH payments." *See generally id.* § 1396r-4.

In response to reports that some hospitals had received DSH payments that exceeded the hospital's operating costs, Congress amended the DSH payment program in

1993 to limit DSH payments based on specific economic circumstances or the uninsured status of the patients served by the hospital. *See id.* § 1396r-4(g); H.R. Rep. No. 103-111, at 211 (1993), *reprinted in* 1993 U.S.C.C.A.N. 278, 538-39, 1993 WL 181528. This hospital-specific limit provides, as relevant to this case, that DSH payments to a particular hospital cannot exceed

> the costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under [the Medicaid Act], other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A). The foregoing language is preceded in the statute by the heading "[a]mount of adjustment subject to uncompensated costs."

Congress again amended the DSH payment program in 2003 to require each state to provide the Secretary with an annual report and audit of its DSH program. *See id.* § 1396r-4(j). Among other things, the audit must confirm that "[o]nly the uncompensated care costs of providing inpatient hospital and outpatient hospital services to individuals described in [42 U.S.C. § 1396r-4(g)(1)(A)] . . . are included in the calculation of the hospital-specific limits." *Id.* § 1396r-4(j)(2)(C). If an audit reveals that a hospital has been overpaid under the DSH program, the state has one year in which to recover or attempt to recover the overpayment from that hospital. *Id.* § 1396b(d)(2)(C). If the state does not do so, future federal Medicaid reimbursements to the state may be adjusted to account for the overpayment. *Id.*

CMS promulgated a final rule implementing the statutory auditing requirement in December 2008 (2008 Rule). Medicaid Program; Disproportionate Share Hospital Payments, 73 Fed. Reg. 77904 (Dec. 19, 2008) (codified at 42 C.F.R. Parts 447 and 455). The 2008 Rule provides that, beginning with DSH payments made in plan rate year 2011, any DSH overpayments must be recovered by the state and returned to the federal government unless they "are redistributed by the State to other qualifying hospitals." 73 Fed. Reg. at 77906. The 2008 Rule requires participating states to submit, on an annual basis, information for each hospital to which the state made a DSH payment. 42 C.F.R. § 447.299(c) (2009). As relevant here, the 2008 Rule requires participating states to report each hospital's "total annual uncompensated care costs," and directs how that amount is calculated:

> (16) *Total annual uncompensated care costs.* The total annual uncompensated care cost equals the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of regular Medicaid FFS rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1011 payments for inpatient and outpatient hospital services. This should equal the sum of paragraphs (c)(9),(c)(12), and (c)(13) subtracted from the sum of paragraphs (c)(10) and (c)(14) of this section.

*Id.* § 447.299(c)(16).

In January 2010, CMS posted a document on its website titled "Additional Information on the DSH Reporting and Audit Requirements." *See* Additional Information on the DSH Reporting and Auditing Requirement, https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/part-1-

additional-info-on-dsh-reporting-and-auditing.pdf (last visited June 22, 2017). This 19-page document contains 37 numbered questions and corresponding answers from CMS regarding the DSH reporting and audit requirements, which the parties in this case refer to as "frequently asked questions" or "FAQs." Here, Plaintiffs challenge CMS's response to FAQ 33. FAQ 33 and the corresponding response from CMS state:

> **33. Would days, costs, and revenues associated with patients that have both Medicaid and private insurance coverage (such as Blue Cross) also be included in the calculation of the MIUR percentage and the DSH limit in the same way States include days, costs and revenues associated with individuals dually eligible for Medicaid and Medicare?**
>
> Days, cost, and revenues associated with patients that are dually eligible for Medicaid and private insurance should be included in the calculation of the Medicaid inpatient utilization rate (MIUR) for the purposes of determining a hospital eligible to receive DSH payments. Section 1923(g)(1) does not contain an exclusion for individuals eligible for Medicaid and also enrolled in private health insurance. Therefore, days, costs, and revenues associated with patients that are eligible for Medicaid and also have private insurance should be included in the calculation of the hospital-specific DSH limit. As Medicaid should be the payer of last resort, hospitals should also offset both Medicaid and third-party revenue associated with the Medicaid eligible day against the costs for that day to determine any uncompensated amount.

*Id.* at 18. In short, CMS's response to FAQ 33 provides that, when calculating the hospital-specific DSH limit, a state must exclude from the "costs incurred during the year of furnishing hospital services" an amount equal to any payments the hospital received from private health insurance with respect to any patients who are *both* Medicaid-eligible *and* privately insured.[1]

---

[1] As relevant here, some children with disabilities may be Medicaid-eligible regardless of the income and resources of their parents and, therefore, may also have private insurance coverage.

## II. This Litigation

Plaintiffs Children's Health Care, doing business as Children's Hospitals and Clinics of Minnesota (Children's Minnesota) and Gillette Children's Specialty Healthcare (Gillette) are pediatric hospitals that operate in Minnesota. Under Minnesota's State Medicaid Plan, Plaintiffs qualify to receive DSH payments. Plaintiffs' patients are children who are Medicaid-eligible, some of whom also have private insurance. In 2015, under protest, Plaintiffs provided the state auditor with data that included private insurance payments Plaintiffs received on behalf of Medicaid-eligible patients who also had private insurance. In March and May 2016, Plaintiffs received the DSH program audit results for fiscal year 2011, which identified DSH overpayments subject to recoupment. In June and November 2016, Plaintiffs received the DSH program audit results for fiscal years 2012 and 2013, respectively, which also identified DSH overpayments subject to recoupment. In response to objections to these audit results, the state auditor cited FAQ 33 as the basis for including private health insurance payments for Medicaid-eligible patients in its calculation of the hospital-specific DSH limit.

On December 2, 2016, Children's Minnesota filed this lawsuit against CMS, the Secretary of HHS, and the Acting Administrator of CMS (collectively, "Defendants"), challenging CMS's directive in FAQ 33 as a violation of the Administrative Procedures Act (APA). Children's Minnesota simultaneously moved for a preliminary injunction preventing Defendants from enforcing FAQ 33. During a court-ordered settlement conference on December 23, 2016, the parties agreed that Children's Minnesota would withdraw its motion for a preliminary injunction and that the parties would instead cross-

move for summary judgment. Based on the parties' agreement, the Court issued a briefing and hearing schedule and consolidated Children's Minnesota's motion for a preliminary injunction with the merits of the case, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. In addition, based on the parties' agreement, the Court ordered Defendants to take no action to enforce FAQ 33 in Minnesota until at least 14 days after this Court renders a decision on the consolidated motion. Children's Minnesota filed an amended complaint on January 10, 2017, adding Gillette as a plaintiff. Plaintiffs, without opposition from Defendants, filed a second amended complaint on February 22, 2017, that does not materially alter the legal claims and serves as the operative complaint.

Plaintiffs' second amended complaint alleges, in two counts, that because Defendants issued FAQ 33 in violation of the APA, FAQ 33 must be set aside for three reasons: (1) it is in excess of statutory jurisdiction or authority or short of statutory right, in violation of the APA, 5 U.S.C. § 706(2)(C); (2) it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A); and (3) it constitutes agency action taken without observance of procedure required by law, in violation of the APA, 5 U.S.C. § 706(2)(D). The first of these three reasons is alleged in Count I of the second amended complaint, and the second and third reasons are alleged in Count II of the second amended complaint. Plaintiffs' pending

motion seeks summary judgment as to both counts, and Defendants' cross-motion seeks dismissal or judgment as a matter of law in their favor as to both counts.[2]

**ANALYSIS**

Summary judgment is proper when the record before the district court establishes that there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, there are no material facts in dispute; the parties' dispute involves purely legal questions.

Plaintiffs challenge FAQ 33 under the APA, 5 U.S.C. § 500 *et seq.* As relevant here, the APA provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> >
> > . . .

---

[2] After the March 30, 2017 hearing on the parties' cross-motions, Plaintiffs notified the Court that Defendants published a new final rule on April 3, 2017 (Final Rule), with an effective date of June 2, 2017. As the Court previously observed, (Dkt. 74), neither the second amended complaint nor the pending cross-motions for summary judgment challenge the new Final Rule, and Plaintiffs subsequently advised the Court that they do not intend to amend their complaint in this matter so as to include a challenge to the new Final Rule. Accordingly, this Order is limited to resolving Plaintiffs' challenge to FAQ 33 and does not address the new Final Rule.

Case 1:14-cv-02066-EGS Document 78 Filed 06/26/17 Page 9 of 22

> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]
>
> (D) without observance of procedure required by law . . . .

5 U.S.C. § 706. If a court vacates an agency action on procedural grounds pursuant to Section 706(2)(D), the court need not also determine whether the same agency action would be arbitrary or capricious or would otherwise exceed the agency's statutory authority if it were enacted using the appropriate procedures. *Iowa League of Cities v. EPA*, 711 F.3d 844, 877 (8th Cir. 2013) (explaining that the "interest in preserving the integrity of the notice and comment process" may outweigh countervailing interests, such as avoiding both delay and regulatory uncertainty). Accordingly, the Court first addresses Plaintiffs' argument, under Count II of the second amended complaint, that FAQ 33 constitutes agency action taken without observance of the procedures required by law in violation of Section 706(2)(D).

## I. Count II

In Count II of the second amended complaint, Plaintiffs contend that Defendants are violating the APA by enforcing FAQ 33 as a binding legal obligation without having provided the required opportunity for notice and comment.

"Agencies must conduct 'rule making' in accord with the APA's notice and comment procedures." *Iowa League of Cities*, 711 F.3d at 855 (citing 5 U.S.C. § 553(b), (c)). Thus, when an agency enacts substantive rules, the APA requires the agency to provide notice of the proposed rule, conduct a hearing or receive and consider public comments, and publish the new rule "not less than 30 days before [the rule's]

effective date." 5 U.S.C. § 553. These requirements apply only to new "legislative rules." *Iowa League of Cities*, 711 F.3d at 855. The notice and comment procedures do *not* apply "to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A); *accord Iowa League of Cities,* 711 F.3d at 855.

Here, it is undisputed that FAQ 33 did not go through the rulemaking procedures required by the APA. Rather, the parties dispute whether FAQ 33 is an interpretive rule that is statutorily exempt from the rulemaking requirements or a legislative rule that is subject to those requirements. Courts "review de novo whether an agency has complied with the APA's procedural requirements because compliance 'is not a matter that Congress has committed to the agency's discretion.' " *United States v. Brewer*, 766 F.3d 884, 887-88 (8th Cir. 2014) (quoting *Iowa League of Cities*, 711 F.3d at 872). Although an agency's characterization of its own rule as either legislative or interpretive is relevant to the court's analysis, "whether and when an agency must follow the law is not an area uniquely falling within its own expertise, and thus the agency's decision [to characterize a rule as interpretive] is less deserving of deference." *Iowa League of Cities*, 711 F.3d at 872.

The critical distinction between a legislative rule and an interpretive rule is that an interpretive rule merely articulates what the administrative agency thinks the statute means and reminds affected parties of existing duties, whereas a legislative rule imposes new rights or duties on the affected parties. *Id.* at 873. A legislative rule is one that expands the "footprint" of a regulation by imposing new requirements, rather than

"interpreting the legal norms Congress or the agency itself has previously created." *Id.* Interpretive rules, by contrast, do not carry the force of law. *Id.* Whether a binding pronouncement is effectively a legislative rule subject to notice and comment procedures depends on whether the pronouncement "substantively amends or adds to, versus simply interpreting the contours of, a preexisting rule." *Id.* The APA's notice and comment exemptions must be construed narrowly because they "secure the values of government transparency and public participation." *Id.*

The United States Court of Appeals for the Eighth Circuit's decision in *Iowa League of Cities* is instructive. In that case, the Iowa League of Cities (League) perceived a conflict between the United States Environmental Protection Agency's (EPA) official written policies and the expectations EPA had been transmitting to state entities regarding regulatory requirements for municipal wastewater treatment processes. *Id.* at 854. In response to a request for clarification made on behalf of the League, EPA sent two letters (the "June 2011 letter" and the "September 2011 letter"). *Id.* Although EPA characterized these as "guidance letters [that] merely discuss existing regulatory requirements," in the League's view, the letters contradicted both the Clean Water Act and EPA's lawfully promulgated regulations. *Id.* Similar to the circumstances here, the League challenged EPA's letters as violations of the APA both procedurally, for failure to comply with the notice and comment rulemaking requirements, and substantively, as exceeding the agency's statutory authority. *See id.*

With respect to the procedural challenge, the Eighth Circuit concluded that both of the challenged EPA letters were legislative rather than interpretive rules and, therefore,

vacated the rules articulated in those letters because they were "promulgated without observance of procedure required by law" in violation of the APA. *Id.* at 874-76 (internal quotation marks omitted). In concluding that the June 2011 letter announced a legislative rule, the Eighth Circuit observed that, in effect, the letter created a new limitation that local authorities "must follow"—a limitation that relevant existing EPA regulations did not impose. *Id.* at 874. Because the June 2011 letter created "a new legal norm" that was not based on a "lawfully promulgated legislative rule," the EPA violated the APA when it bypassed the notice-and-comment procedures. *Id.* at 874-75. With respect to the September 2011 letter, the Eighth Circuit similarly concluded that the rule announced in the letter was "irreconcilable" with EPA's regulations and "[t]he effect of this letter is a new legislative rule" that imposed new requirements on the regulated municipalities. *Id.* at 875-76. Thus, the September 2011 letter also violated the APA because it bypassed the notice-and-comment procedures. *Id.* at 876.

Here, Defendants argue that "FAQ 33 merely explains how the Secretary's existing [2008] Rule applies with respect to costs incurred treating Medicaid-eligible patients who have third-party insurance coverage—it does not modify or depart from the earlier Rule." This argument is unavailing. The duly promulgated 2008 Rule describes how a state should calculate the hospital-specific DSH limit for auditing purposes, in relevant part, as follows:

> The total annual uncompensated care cost equals the ***total cost of care*** for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive ***less the sum*** of regular Medicaid FFS rate payments, Medicaid managed care organization

> payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1011 payments . . . .

42 C.F.R. § 447.299(c)(16) (2009) (emphasis added). The 2008 Rule also defines "total cost of care" as "[t]he total annual costs incurred by each hospital for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals." *Id.* § 447.299(c)(10). The 2008 Rule also defines the payments that are subtracted from the "total cost of care"—namely, Medicaid payments and payments from uninsured patients. *Id.* § 447.299(c)(6)-(9). The 2008 Rule does not include private insurance as part of this calculation. *See Watt v. GMAC Mortg. Corp.*, 457 F.3d 781, 783 (8th Cir. 2006) ("A standard axiom of statutory interpretation is *expressio unius est exclusio alterius*, or the expression of one thing excludes others not expressed.").

Defendants argue that the 2008 Rule "makes clear that the 'costs' considered in the calculation of 'uncompensated costs' under section 1396r-4(g)(1) include only '*unreimbursed* costs.' " In support of this argument, Defendants cite the following passage from the preamble to the 2008 Rule:

> [T]he uncompensated care cost[s] eligible under the hospital-specific DSH limit include the *unreimbursed costs* of providing inpatient and outpatient hospital services to Medicaid eligible individuals and the *unreimbursed costs* of providing inpatient and outpatient hospital services to individuals with *no source* of third party reimbursement for the inpatient and outpatient hospital services they receive.

73 Fed. Reg. at 77920 (emphasis added). But the preamble to an agency regulation generally is consulted only if the regulation is ambiguous. *See Advanta USA, Inc. v. Chao*, 350 F.3d 726, 729 (8th Cir. 2003); *cf. District of Columbia v. Heller*, 554 U.S. 570, 578 n.3 (2008) (explaining that, when interpreting a statute, "the settled principle of law

is that the preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms" (internal quotation marks omitted)). Here, the calculation outlined in the 2008 Rule provides that "total annual uncompensated care cost equals the ***total cost of care . . . less the sum*** " of specific, enumerated payments that do *not* include private insurance. 42 C.F.R. § 447.299(c)(16) (2009) (emphasis added). Defendants appear to argue that the "total cost of care" side of this equation excludes private insurance. But the text of the 2008 Rule provides no support for this contention. The 2008 Rule defines "total cost of care" as "total annual costs incurred by each hospital." *Id.* § 447.299(c)(10). Despite expressly identifying the types of payments that must be subtracted from the "costs incurred" by each hospital, the 2008 Rule provides no textual support for the Defendants' position that private insurance payments for Medicaid-eligible patients must be excluded. Because the 2008 Rule is unambiguous, the preamble need not be consulted.

Even if considered, the preamble to the 2008 Rule does not support Defendants' position for several reasons. First, the preamble states multiple times that the 2008 Rule does not substantively alter the calculation of the hospital-specific DSH limit as established in the Medicaid statute. *See* 73 Fed. Reg. at 77907 ("Moreover, the [2008] rule does not substantively change the standards for DSH payments, or for the review of hospital-specific limits on such payments."); *id.* at 77921 ("[T]his regulation does not change the underlying statutory requirements for DSH payments."); *id.* at 77906 ("This regulation does not alter any of the substantive standards regarding *the calculation* of hospital costs." (Emphasis added.)). Defendants concede that the Medicaid statute does

not *require* private insurance to be accounted for in the calculation of the hospital-specific DSH limit. Instead, Defendants argue, doing so is within the Secretary's *discretion*. Assuming, without deciding, that the Medicaid statute gives the Secretary such discretion, that discretion has not been exercised in the 2008 Rule. To the contrary, the preamble states that the 2008 Rule is coextensive with the Medicaid statute, which Defendants concede does *not* require private insurance to be accounted for in the calculation of the hospital-specific DSH limit absent the exercise of the Secretary's discretion.

Second, the preamble to the 2008 Rule references a "General DSH Audit and Reporting Protocol," which is available on CMS's website to assist states and their auditors "to determine uncompensated care costs consistent with the statutory requirements." 73 Fed. Reg. at 77921; *accord id.* at 77930, 77931, 77936. According to the preamble, this protocol provides "detailed identification of the data elements necessary to comply with Congressional instruction on such reporting and auditing," and states that "[t]he definitions of the data elements track the statutory language, and do not change the calculation that should have always been performed." *Id.* at 77921. Notably, this protocol does not appear to reference as "data elements" any payments from private insurance.

Third, although the text of the preamble references "unreimbursed costs," it does not define that phrase. The relevant portion of the 2008 Rule refers not to "unreimbursed costs" but, rather, to "total annual uncompensated care cost," which the 2008 Rule defines by reference to the formula discussed above—a formula that does not account for

private insurance payments. And the preamble's reference to "individuals with *no source* of third party reimbursement," 73 Fed. Reg. at 77920 (emphasis added), pertains to uninsured patients who are subject to a calculation distinct from Medicaid-eligible individuals and, therefore, has no relevance here. *See* 42 C.F.R. § 447.299(c)(12)-(15) (2009) (describing the formula for determining total uncompensated care costs for uninsured individuals as distinct from Medicaid-eligible individuals). Contrary to Defendants' argument, the preamble explains that "all costs for services that are within the definition of inpatient hospital services and outpatient hospital services . . . should be included." 73 Fed. Reg. at 77920. For the foregoing reasons, the text of the preamble does not support Defendants' position.

Defendants also cite *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995), in support of their argument that FAQ 33 is interpretive. *Guernsey* involved an HHS regulation that permitted hospitals to receive Medicare reimbursement for the "cost of services rendered . . . during a given year." 514 U.S. at 99. HHS interpreted the regulation to require the costs associated with issuing bonds to be amortized across the life of the bonds, rather than recognized at once. *Id.* at 97-98. The HHS interpretation in *Guernsey* clarified what it meant for costs to be incurred "during a given year." By contrast, FAQ 33 substantively alters the detailed formula set forth in the 2008 Rule for calculating the hospital-specific DSH limit. Thus, *Guernsey* is inapposite.

Defendants also contend that FAQ 33 *must* be interpretive because the Secretary cannot enforce it directly, but instead may enforce only the 2008 Rule itself. That argument, however, assumes that FAQ 33 is consistent with the requirements of the 2008

Rule. An interpretive rule must have "some external legal basis" to which it is tethered. *Iowa League of Cities*, 711 F.3d at 874. As addressed above, the 2008 Rule does not provide an external legal basis for FAQ 33. Moreover, the record reflects that when Plaintiffs objected to the audit results, the state auditor cited FAQ 33—not the 2008 Rule—as the reason that private insurance payments must be included when calculating the hospital-specific DSH limit. And it is undisputed that Defendants intend to enforce the results of the audits, which require recoupment of alleged DSH overpayments and will, therefore, have a substantive effect on Plaintiffs. Thus, Defendants' contention that FAQ 33 has no independent legal effect is erroneous.

Finally, Defendants argue that the agency's interpretation of the 2008 Rule is entitled to deference. But, as addressed above, an agency's characterization of a rule as interpretive rather than legislative "is less deserving of deference." *Id.* at 872. And an agency's interpretation of its regulation is entitled to deference "only when the language of the regulation is ambiguous." *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000). The Supreme Court of the United States has cautioned against deferring to an agency's interpretation of its regulation when doing so would "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Id.* Here, because FAQ 33 substantively alters and amends the formula articulated in the 2008 Rule, the agency's interpretation of the 2008 Rule and FAQ 33 is not entitled to deference.

Notably, three other federal courts have addressed challenges to FAQ 33 and reached the same conclusion. *See Children's Hosp. of the King's Daughters, Inc. v. Price*, No. 2:17cv139, slip op. at 31-32 (E.D. Va. June 20, 2017) (granting preliminary

injunction to plaintiff and concluding that "FAQ 33 is a substantive rule that should have been promulgated pursuant to notice-and-comment"); *N.H. Hosp. Ass'n v. Burwell*, No. 15-cv-460, 2017 WL 822094, at *16 (D.N.H. Mar. 2, 2017) (granting summary judgment to plaintiffs and permanently enjoining defendants from enforcing FAQ 33 "until and unless those policies and procedures are replaced by an enforceable and properly promulgated regulation"); *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 239-41 (D.D.C. 2014) (granting plaintiffs' motion for preliminary injunction and concluding that plaintiffs are likely to succeed on the merits of their argument that FAQ 33 is a substantive rule that constitutes a violation of the APA's notice-and-comment requirements). Although these decisions are not binding on this Court, they offer additional persuasive authority for the conclusions reached herein. Moreover, Defendants have not persuasively demonstrated that those decisions are either materially distinguishable from this case or legally incorrect.

In summary, because FAQ 33 alters the formula articulated in the 2008 Rule for calculating the hospital-specific DSH limit by requiring states to include private insurance payments, FAQ 33 is a substantive legislative rule that should have been, but was not, promulgated through the notice-and-comment rulemaking process required by the APA. *See Iowa League of Cities*, 711 F.3d at 873. Consequently, Defendants violated the APA's procedural requirements by not using the notice-and-comment procedures, and FAQ 33 must be vacated because it is "without observance of procedure

required by law." 5 U.S.C. § 706(2)(D). Accordingly, Plaintiffs' motion for summary judgment is granted with respect to Count II of the second amended complaint.[3]

## II. Count I

In Count I of the second amended complaint, Plaintiffs alternatively argue that even if FAQ 33 had been promulgated through the proper notice-and-comment rulemaking procedures as required by the APA, it would nonetheless need to be "set aside . . . [as] in excess of statutory jurisdiction, authority, . . . or short of statutory right." 5 U.S.C. § 706(2)(C). This Court first must determine whether it is appropriate to reach this issue in light of the foregoing conclusion that FAQ 33 must be set aside because it is procedurally unlawful.

The Eighth Circuit addressed this same issue in *Iowa League of Cities*, when the court contemplated whether, having determined that the challenged agency action must be vacated on procedural grounds, the court should nonetheless address the substantive challenge to the agency action. 711 F.3d at 877 (citing *NRDC v. EPA*, 643 F.3d 311, 321 (D.C. Cir. 2011)). The Eighth Circuit observed:

> [This] decision implicates competing tensions, both compelling. If we choose to vacate solely on procedural grounds, regulated entities who have already spent considerable time crossing the hot shoals of regulatory uncertainty must continue to do so. On the other hand, should we move to the merits of whether the [agency's] legislative rules reflect an arbitrary and capricious interpretation of the [statute], we short-circuit the APA's notice and comment procedures and preclude interested parties from participating in the agency's analytic process.

---

[3] In light of the foregoing conclusion, the Court need not address the alternative allegation in Count II that FAQ 33 is arbitrary, capricious, an abuse of discretion, or not in accordance with law.

*Id.*; *cf. Smiley v. Citibank, N.A.*, 517 U.S. 735, 741 (1996) (observing that "the notice-and-comment procedures of the Administrative Procedure Act [are] designed to assure due deliberation"). In resolving this tension, the Eighth Circuit concluded that, unless the vacated rule is "obviously precluded" by the statute, the agency should be permitted to seek to institute the rule using the proper procedures. *Iowa League of Cities*, 711 F.3d at 877; *accord NRDC*, 643 F.3d at 321 (declining to address whether a procedurally unlawful agency rule exceeded the agency's statutory authority because "by weighing in now we would unfairly prejudge any future notice and comment process").

Here, the circumstances weigh against deciding whether FAQ 33, if promulgated through the appropriate procedures, would exceed statutory authority. As was the case in *Iowa League of Cities*, the challenged rule at issue here is not obviously precluded by the statute. Defendants argue that the phrase "as determined by the Secretary" in the Medicaid statute necessarily grants the Secretary discretion to define "costs incurred," as well as the discretion to include private insurance payments as offsets to costs. The district courts in both *New Hampshire Hospital Ass'n* and *Texas Children's Hospital* acknowledged that this argument might be correct but expressly declined to decide whether FAQ 33, if promulgated through the appropriate procedures, would exceed statutory authority. *See N.H. Hosp. Ass'n*, 2017 WL 822094, at *12; *Tex. Children's Hosp.*, 76 F. Supp. 3d at 241 n.5. Indeed, having concluded here that FAQ 33 must be set aside for failure to follow the proper procedures, it would be merely advisory for this Court to decide whether Defendants would exceed their statutory authority if they

attempted to promulgate the rule expressed in FAQ 33 by following the required procedures.

For these reasons, the Court declines to address whether FAQ 33 exceeds statutory authority so as to avoid unfairly prejudging any future notice-and-comment process. Accordingly, Plaintiffs' motion for summary judgment is denied with respect to Count I of the second amended complaint, and Count I is dismissed without prejudice as moot.

### III. Defendants' Cross-Motion for Summary Judgment

In light of the foregoing conclusions, Defendants' cross-motion to dismiss or, in the alternative, for summary judgment is denied.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1. Plaintiffs' motion for summary judgment, (Dkt. 34), is **GRANTED IN PART** with respect to Count II of the second amended complaint as provided herein.

2. FAQ 33 is **VACATED** as procedurally invalid, and Defendants are permanently enjoined from enforcing FAQ 33. Defendants shall follow the relevant policies and procedures in effect before Defendants issued FAQ 33 unless and until those policies and procedures are replaced by an enforceable and properly promulgated regulation.

3. Plaintiffs' motion for summary judgment, (Dkt. 34), is **DENIED IN PART** as moot with respect to Count I of the second amended complaint, and Count I of the second amended complaint is **DISMISSED WITHOUT PREJUDICE**.

4. Defendants' motion to dismiss or, in the alternative, for summary judgment, (Dkt. 43), is **DENIED**.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: June 26, 2017

s/Wilhelmina M. Wright
Wilhelmina M. Wright
United States District Judge