**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                              )
TEXAS CHILDREN'S HOSPITAL and )
SEATTLE CHILDREN'S HOSPITAL,  )
                              )
            Plaintiffs,       )
                              )
        v.                    )   Civ. Action No. 14-2060 (EGS)
                              )
ALEX AZAR, Secretary,         )
United States Department of   )
Health and Human Services,    )
et al.,[1]                    )
                              )
            Defendants.       )
_____)
```

<u>**MEMORANDUM OPINION**</u>

On December 29, 2014, the Court granted a motion for a
preliminary injunction brought by plaintiffs Texas Children's
Hospital ("Texas Children's") and Seattle Children's Hospital
("Seattle Children's")(collectively "plaintiffs"). *See* Order,
Dec. 29, 2014, ECF No. 19. The Court's Order enjoined the
Secretary of Health and Human Services ("the Secretary"), the
Centers for Medicare and Medicaid Services ("CMS"), and the
Administrator of CMS (collectively "defendants") from
"enforcing, applying, or implementing FAQ No. 33" pending

---

[1]     Pursuant to Federal Rule of Civil Procedure 25(d), the
Court substitutes as defendant the Secretary of Health and Human
Services, Alex Azar, for former Secretary of Health and Human
Services Sylvia M. Burwell. Likewise, Seema Verma, Administrator
of the Centers for Medicare and Medicaid Services, is
substituted for Marilyn B. Tavenner.

further Order of this Court. *Id.* Currently pending before the
Court are defendants' motion to dismiss for lack of subject
matter jurisdiction or, in the alternative, for summary
judgment, and plaintiffs' cross-motion for summary judgment.
Upon consideration of the motions, the responses and replies
thereto, the applicable law, the entire record, and for the
reasons stated below, defendants' motion is **DENIED**, and
plaintiffs' motion is **GRANTED.**

I.   **BACKGROUND**

The Court elaborated on the facts of this case in detail in
its prior Memorandum Opinion accompanying the Court's Order
granting plaintiffs' motion for a preliminary injunction. *See
Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 228-35
(D.D.C. 2014). The Court provides only a brief summary of the
facts here.

Plaintiffs Texas Children's and Seattle Children's are two
not-for-profit teaching and research hospitals in Texas and
Washington state, respectively. Compl., ECF No. 1 ¶ 1. The
hospitals treat "[c]hildren with critical illnesses and special
needs . . . from throughout the United States" and do so
"regardless of their families' ability to pay for their care."
*Id.* Plaintiffs treat a "disproportionately larger share of
Medicaid program patients." *Id.* ¶ 3. Plaintiffs also "serve many
. . . very sick and medically fragile children," meaning that

"they have an unusual number of patients who meet the qualifying criteria for Medicaid eligibility for reasons other than income status." *Id.* ¶ 48.

A.    **The Medicaid Act**

Medicaid, 42 U.S.C. § 1396, *et seq.*, "provid[es] federal financial assistance to States that choose to reimburse certain costs for medical treatment for needy persons." *Harris v. McRae*, 448 U.S. 297, 301 (1980). In addition to covering low-income individuals, Medicaid also provides benefits to children with serious illnesses, without regard to family income. *See, e.g.*, 42 U.S.C. § 1396a(a)(10)(A)(i)(II)(children are eligible for Medicaid if they are eligible for Supplemental Security Income); 20 C.F.R. § 416.934(j)(children born weighing less than 1,200 grams are eligible for Supplemental Security Income).

In 1981, Congress amended Medicaid to require states to ensure that payments to hospitals "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. § 1396a(13)(A)(iv). This amendment reflected "Congress's concern that Medicaid recipients have reasonable access to medical services and that hospitals treating a disproportionate share of poor people receive adequate support from Medicaid." *W. Va. Univ. Hosps. v. Casey*, 885 F.2d 11, 23 (3d Cir. 1989). To defray the costs associated with treating Medicaid patients, the

3

amendment created "payment adjustments" available to hospitals who treat a disproportionate share of Medicaid patients (a disproportionate-share hospital or "DSH"). 42 U.S.C. § 1396r-4(b)-(c).

Congress amended the program in 1993 to limit DSH payments on a hospital-specific basis. *See id.* § 1396r-4(g). Under the amendment, a DSH payment may not exceed:

> [T]he costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A). This cap on DSH payments is known as the "hospital-specific limit." *See* Compl., ECF No. 1 ¶ 25.

To ensure the appropriateness of DSH payments, Congress implemented an annual audit requirement in 2003, which required hospitals to certify, among other things, that:

> (C) Only the uncompensated care costs of providing inpatient hospital and outpatient hospital services to individuals described in [Section 1396r-4(g)(1)(A)] . . . are included in the calculation of the hospital-specific limits;
>
> (D) The State included all payments under this subchapter, including supplemental payments, in the calculation of such hospital-specific limits[; and]

4

> (E) The State has separately documented and
> retained a record of all its costs under this
> subchapter, claimed expenditures under this
> subchapter, uninsured costs in determining
> payment adjustments under this section, and
> any payments made on behalf of the uninsured
> for payment adjustments under this section.

42 U.S.C. § 1396r-4(j)(2). Overpayments must be recouped by the

state within one year of their discovery or the federal

government may reduce its future contribution. *See id.* §

1396b(d)(2)(C)-(D).

## B.    The 2008 Final Rule

On December 19, 2008, CMS issued a Final Rule ("the 2008

Rule") outlining specific audit and reporting requirements to

ensure compliance with the statutory framework for calculating

DSH payments. *See* Disproportionate Share Hospital Payments, 73

Fed. Reg. 77904 (Dec. 19, 2008). The 2008 Rule requires that the

states annually submit certain information "for each DSH

hospital to which the State made a DSH payment." 42 C.F.R. §

447.299(c). One such piece of information is the hospital's

"total annual uncompensated care costs," which the Rule defines

as an enumerated set of "costs" minus an enumerated set of

"payments":

> The total annual uncompensated care cost
> equals the total cost of care for furnishing
> inpatient hospital and outpatient hospital
> services to the Medicaid eligible individuals
> and to individuals with no source of third
> party coverage for the hospital services they
> receive less the sum of regular Medicaid FFS

rate payments, Medicaid managed care
organization payments, supplemental/enhanced
Medicaid payments, uninsured revenues, and
Section 1101 payments for inpatient and
outpatient hospital services.

*Id.* § 447.299(c)(16). The 2008 Rule further specifically defined

each type of cost and payment to be included in the calculation.

*See id.* § 447.299(c)(9),(10),(12),(13),(14).

## C. Frequently Asked Question ("FAQ") 33

On January 10, 2010, CMS posted to the Medicaid.gov website

answers to questions regarding the reporting and audit

requirements. *See* Compl., ECF No. 1 ¶ 49. At issue in this case

is FAQ 33 which reads:

> **33. Would days, costs, and revenues associated
> with patients that have both Medicaid and
> private insurance coverage (such as Blue
> Cross) also be included in the calculation of
> the MIUR percentages and the DSH limit in the
> same way States include days, costs, and
> revenues associated with individuals dually
> eligible for Medicaid and Medicare?**
>
> Days, costs, and revenues associated with
> patients that are dually eligible for Medicaid
> and private insurance should be included in
> the calculation of the Medicaid inpatient
> utilization rate (MIUR) for the purposes of
> determining a hospital eligible to receive DSH
> payments. Section 1923(g)(1) does not contain
> an exclusion for individuals eligible for
> Medicaid and also enrolled in private health
> insurance. Therefore, days, costs, and
> revenues associated with patients that are
> eligible for Medicaid and also have private
> insurance should be included in the
> calculation of the hospital-specific DSH
> limit. As Medicaid should be the payer of last
> resort, hospitals should also offset both
> Medicaid and third-party revenue associated

> with the Medicaid eligible day against the
> costs for that day to determine any
> uncompensated care amount.

*Id.* ¶ 50.

After FAQ 33 was posted, plaintiffs were informed by their
respective state health care agencies that their hospital-
specific limit calculations would be altered. *See* Decl. of
Robert Simon, ECF No. 3-8 ¶ 23. In particular, both hospitals
were informed that costs reimbursed by private insurance would
now be included in the calculation for their DSH payments. *See,
e.g., id.* ¶¶ 23-25. The inclusion of private-insurance payments
in the calculation of each hospital's limit significantly
reduced — or eliminated entirely — each hospital's DSH payments.
*See, e.g., id.* ¶ 24(stating that Texas Children's hospital-
specific limit was reduced by approximately $12 million when
third-party insurance payments were used to offset Medicaid-
allowable costs).

### D.  Preliminary Injunction

Plaintiffs filed this lawsuit on December 5, 2014. *See*
Compl., ECF No. 1. That same day, they filed a motion for a
preliminary injunction requesting that the Court enjoin
defendants from enforcing or applying FAQ 33 during the pendency
of this case. *See* Pls.' Mem. in Supp. of Mot. for Prelim. Inj.,
ECF No. 3-1. On December 29, 2014, the Court granted plaintiffs'
motion for a preliminary injunction to prevent the enforcement

of the policy embodied in FAQ 33. *See Texas Children's Hospital*

*v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014). Accordingly,

defendants

> temporarily halt[ed] the enforcement, application, and implementation of FAQ No. 33 in Texas and Washington, notifying the Texas and Washington state Medicaid programs that, pending further order by the Court, the enforcement of FAQ No. 33 is enjoined and that defendants will take no action to recoup any federal DSH funds provided to Texas and Washington . . . based on a state's noncompliance with FAQ 33.

Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Summ. J.

Mem."), ECF No. 25-1 at 8.[2]

### E.   Other Litigation

Since the Court's Order granting plaintiffs' motion for a

preliminary injunction on December 29, 2014, similar lawsuits by

other hospitals challenging FAQ 33 have been filed in federal

courts in New Hampshire, Virginia, Tennessee, Missouri, and

Minnesota. Several of those courts have adjudicated the merits

of plaintiffs' claims and, in each instance, have enjoined

defendants from enforcing FAQ 33. *See New Hampshire Hosp. Ass'n*

*v. Burwell*, No. 15-cv-460, 2017 WL 822094 (D.N.H. Mar. 2, 2017),

ECF No. 39-1 (permanently enjoining defendants from enforcing

FAQs 33 and 34), *aff'd*, 887 F.3d 62 (1st Cir. 2018); *Tennessee*

---

[2]   When citing to the electronic filings in this opinion, the Court cites to the ECF page numbers, not the page number of the filed document.

*Hosp. Ass'n v. Price*, No. 16-cv-3263, 2017 WL 2703540 (M.D.
Tenn. June 21, 2017), ECF No. 42-1 (granting plaintiffs' summary
judgment and enjoining defendants from applying FAQ 33 to
plaintiffs' hospitals); *Children's Health Care v. Burwell*, 16-
cv-4064 (D. Minn. June 26, 2017), ECF No. 43-1 (permanently
enjoining defendants from enforcing FAQ 33); *Children's Hosp. of
the King's Daughters, Inc. v. Price*, 258 F. Supp. 3d 672 (E.D.
Va. 2017), ECF No. 41-1 (granting plaintiff's motions for
preliminary-injunctive relief and enjoining defendants from
taking any action "to enforce against the Plaintiff FAQ 33,
absent further order of the court"); *Missouri Hosp. Ass'n v.
Hargan*, No. 2:17-cv-4052, 2018 WL 814589 (W.D. Mo. Feb. 9,
2018), ECF No. 44-1 (granting plaintiff's motion for summary
judgment and enjoining defendants from enforcing FAQ 33).

## II.  Standard of Review

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

Under Rule 12(b)(1), the plaintiff bears the burden of
establishing jurisdiction by a preponderance of the evidence.
*See Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992);
*Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C.
2002). Federal courts are courts of limited jurisdiction and the
law presumes that "a cause lies outside this limited
jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511

9

U.S. 375, 377 (1994); *see also Gen. Motor Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Article III as well as statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. Dist. of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compangine des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. Dist. of Columbia Bd. of Elections & Ethics,* 104 F. Supp. 2d 18, 22 (D.D.C. 2000); *see also Jerome Stevens Pharms., Inc. v. Food and Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B.    Motion for Summary Judgment

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the [Administrative

Procedure Act] standard of review." *Loma Linda Univ. Med. Ctr.*
*v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing
*Stuttering Found. Of Am. v. Springer*, 498 F. Supp. 2d 203, 207
(D.D.C. 2007)). Due to the limited role of a court in reviewing
the administrative record, however, the typical summary judgment
standards set forth in Rule 56(c) are not applicable.
*Stuttering*, 498 F. Supp. 2d at 207 (internal citation omitted).
Rather, under the Administrative Procedure Act ("APA"), "it is
the role of the agency to resolve factual issues to arrive at a
decision that is supported by the administrative record, whereas
'the function of the district court is to determine whether or
not as a matter of law the evidence in the administrative record
permitted the agency to make the decision it did.'" *Id.*
(citation omitted). In ruling on cross-motions for summary
judgment, the court shall grant summary judgment only if one of
the moving parties is entitled to judgment as a matter of law
upon material facts that are not genuinely disputed. *See*
*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of*
*Justice*, 658 F. Supp. 2d 217, 224 (D.D.C. 2009) (citation
omitted). A reviewing court may "hold unlawful and set aside
agency action, findings, and conclusions found to be . . .
arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with the law." *Ludlow v. Mabus*, 793 F. Supp. 2d
352, 354 (D.D.C. 2001) (quoting 5 U.S.C. § 706(2)(A)).

## III. DISCUSSION

Plaintiffs argue that (1) FAQ 33 was promulgated without appropriate notice-and-comment procedures in violation of the APA; and (2) the policy set forth in FAQ 33 is a substantive violation of the Medicaid Act. *See generally* Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Summ. J. Mem."), ECF No 26-1. Defendants dispute both of these arguments and further argue that plaintiffs lack standing to challenge FAQ 33. *See generally* Defs.' Summ. J. Mem., ECF No. 25-1. Defendants contend that FAQ 33 is not the legal source of the policy requiring the inclusion of private-insurance payments in the hospital-specific limit calculation, and that FAQ 33 has no independent legal effect. *Id.* at 10-12. Defendants' standing and merits argument both turn, in part, on resolution of the same question, namely whether FAQ 33 has an independent legal effect. Accordingly, the Court addresses that question first, before turning to defendants' arguments on standing and the merits of plaintiffs' claims.

### A.    FAQ 33 Has An Independent Legal Effect.

Defendants assert that FAQ 33 is not the source of the policy requiring private-insurance payments to be included in the hospital-specific limit calculation for DSH payments (herein after "the policy") and that FAQ 33 merely "restates a longstanding and consistent interpretation of the governing

12

statute." Defs.' Summ. J. Mem., ECF No. 25-1 at 11. The Court

considers the governing statute, 42 U.S.C. § 1396r-4, and the

governing rule, 42 C.F.R. § 447.299, in turn.

### 1. The Medicaid Statute Does Not Compel Implementation Of The Policy.

As the Court's previous opinion recognized, the policy set

forth in FAQ 33 is "not codified by the Medicaid Act." *Texas*

*Children's*, 76 F. Supp. 3d at 236. The Medicaid Act defines the

hospital-specific limit for DSH payments as:

> [T]he costs incurred during the year of furnishing hospital services (as defined by the Secretary and net of payments under this subchapter, other than under this section, by uninsured patients) by the hospital to individuals who either are eligible for medical services under the State plan or have no health insurance or other source of third party coverage) for services provided during the year.

42 U.S.C. § 139r-4(g)(1)(A). The text of the statute requires

that Medicaid payments ("payments under this subchapter") and

"payments . . . by uninsured patients" be offset against the

"costs incurred" by the hospital. But the statute does not list

private-insurance payments as payments that must be offset.

Defendants argue that the phrase "costs incurred" in the

text of the statute only refers to "*uncompensated* costs." Defs.'

Summ J. Mem., ECF No. 25-1 at 19-20. Thus, according to

defendants' interpretation, any private-insurance payments must

be subtracted from the cost side of the hospital-specific limit

calculation. As support for their position, defendants point to the heading of subsection 1396r-4(g)(1) which reads: "Amount of adjustment subject to uncompensated costs." *Id.* at 20. Plaintiffs respond that the text of the heading "cannot overcome the plain language of the statute that unambiguously defines uncompensated costs." Pls.' Summ. J. Mem., ECF No. 26-1 at 31-32.

The heading of a statutory section is a tool "available for the resolution of a doubt about the meaning of a statute." *Yates v. United States*, 135 S. Ct. 1074, 1083 (2015) (quoting *Almenarez-Torres v. United States*, 523 U.S. 224, 234 (1998)). Nevertheless, headings are "not dispositive." *Id.* (Alito, J., concurring)(noting that without other textual features supporting a particular interpretation, the "title would not be enough on its own."). Furthermore, "the heading of a section cannot limit the plain meaning of the text." *Id.* at 1094 (Kagan, J., dissenting) (quoting *Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947)).

The text of the statute in this case clearly does not include an offset for private-insurance payments: section 1396r-4(g)(1)(A) defines the costs incurred of furnishing hospital services as "determined by the Secretary and net of payments under this subchapter, other than under this section, by uninsured patients." While defendants' reading of "uncompensated

14

costs" suggests that costs reimbursed by private-insurance companies should be offset, the heading "cannot limit the plain meaning of the text." *Yates*, 135 S. Ct. 1094.

Even if the statute's text were ambiguous, headings are not dispositive, but merely one tool of interpretation. *Id.* Indeed, other textual clues directly contradict the defendants' reading of subsection (g)(1). For example, in the subsection immediately following subsection (g)(1), Congress establishes a formula for payment adjustments to certain hospitals with a *high* disproportionate-share during a two-year transitional period. *See* 42 U.S.C. § 1396r-4(g)(2)(A).[3] That subsection explicitly offsets "any amount received . . . from *third party payors* (not including the State plan under this title."). *Id.* (emphasis added). Thus, during the transitional period, Congress specifically provided for an offset of private-insurance payments for high disproportionate-share hospitals. Congress had the opportunity and knew how to include private insurance in defining the offset under subsection (g)(1), but chose not to. In such a case, "when Congress includes particular language in one section of a statute but omits in in another — let alone the

---

[3]     Plaintiffs do not allege they are high disproportionate-share hospitals. Thus, subsection (g)(2)(A) is not directly applicable to plaintiffs, though the comparison is useful for purposes of statutory interpretation.

very next provision — this Court presumes that Congress intended a difference in meaning." *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014).

In short, because the language of the statute does not unambiguously require the implementation of the policy set forth in FAQ 33, the statute cannot be the legal source of the policy.[4]

### 2. The 2008 Rule is Not the Legal Source of the Policy Because the Rule and the Policy Contradict One Another.

Defendants argue that if the Medicaid Act itself is not the source of the policy, then the 2008 Rule which was promulgated through notice-and-comment procedures is the legal source of the policy. *See* Defs.' Summ J. Mem., ECF No. 26-1 at 12-17. Undoubtedly, the statute provides the Secretary with some discretion to promulgate rules through notice-and-comment procedures to determine the boundaries of "costs incurred during the year of furnishing hospital services." 42 U.S.C. § 1396r-

---

[4]     Defendants also point to 42 U.S.C. § 1396r-(j)(2)(C), which sets forth the state annual reporting requirements, arguing that because states are required to certify in the audit that "[o]nly the uncompensated care costs" of services are included in the hospital-specific limit calculation, private insurance payments must be excluded from the costs side of the DSH calculation. Defs.' Summ J. Mem., ECF No. 26-1 at 15. This argument is flawed in at least two respects: first, the phrase "uncompensated care costs" is used as a term of art to refer to costs as previously defined in the statute under subsection (g), and second, the term "uncompensated costs" is specifically defined otherwise in the 2008 Rule. *See infra* Section III.A.2.

4(g)(1)(A). The 2008 Rule, 42 C.F.R. § 447.299, however, not only does not require a private-insurance payment offset, but also precludes implementation of the defendants' policy. The text of the 2008 Rule specifically describes how to calculate the hospital-specific limit for DSH payments and does not include an offset for private-insurance payments in that calculation. As such, the policy stands in direct conflict with the 2008 Rule.

Defendants argue that the 2008 Rule itself, through its use of the term "costs incurred," "provide[s] a clear textual foundation for the agency's interpretation." Defs.' Summ J. Mem., ECF No. 25-1 at 12-16. They contend that their interpretation is further supported by reading the 2008 Rule with the accompanying Federal Register notice. *Id*. at 13. Moreover, defendants assert that their interpretation must be given "controlling weight" under the *Seminole Rock-Auer* deference standard unless it is "plainly erroneous or inconsistent with the regulations." *Id.* at 16. The Court addresses each of these arguments in turn.

> **a. The 2008 Rule Clearly Defines "Uncompensated Care" and "Costs Incurred" in Such a Way that Precludes Defendants' Interpretation.**

Defendants make a number of arguments in support of their contention that FAQ 33 is consistent with the 2008 Rule. First, they argue that the term "costs" and "incurred" have been

17

interpreted by numerous courts "as excluding expenses that are offset by payments or reimbursements." Defs.' Summ J. Mem., ECF No. 25-1 at 13-14. Defendants also contend that the use of the term "uncompensated care costs" in the heading of 42 C.F.R. § 447.299(c)(16) and the reference to "costs incurred" in 42 C.F.R. § 447.299(c)(10) require that costs reimbursed by private insurance not be included in the hospital-specific limit calculation. *Id.* at 13.

Defendants' arguments fail. When the text of a rule is plain, the Court must enforce it according to its terms. *See King v. Burwell*, 135 S. Ct. 2480, 2589 (2015). But "oftentimes the meaning — or ambiguity — of certain words or phrases may only become evident when placed in context. So when deciding whether there is a plain reading of the language, we must read the words in their context and with a view to their place in the overall statutory scheme." *Id.* (internal citations omitted).

The 2008 Rule defines "Total annual uncompensated care costs" as follows:

> The total annual uncompensated care cost equals the total cost of care for furnishing hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of regular Medicaid FFS rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1101 payments for inpatient and outpatient

> hospital services. This should equal the sum
> of paragraphs (c)(9), (c)(12), and (c)(13)
> subtracted from the sum of paragraphs
> (c)(10) and (c)(14).

42 C.F.R. § 447.299(c)(16).

Reading the phrase "uncompensated care costs" in context, the Rule defines specifically how to calculate the uncompensated care costs: by adding certain enumerated payments and then subtracting from that sum the "total cost of care" for inpatient and outpatient services. *See id.* The payments side of the equation includes: (1) certain specialized Medicaid payments, *see* 42 C.F.R. § 447.299(c)(9); (2) payments made by individuals with no source of third party coverage, *see id.* § 447.299(c)(12); and (3) applicable section 1101 payments, *see id.* § 447.299(c)(13). Notably, these enumerated payments do not include payments received from private-insurance companies on behalf Medicaid-eligible patients.

Defendants point to the "costs" side of the equation to support their interpretation and the policy embodied in FAQ 33. The "costs" to be considered in determining "uncompensated care costs" include (1) "[t]he total annual costs incurred by each hospital for furnishing hospital and outpatient hospital services to Medicaid eligible individuals," *see* 42 C.F.R. § 447.299(c)(10); and (2) "the total costs incurred for furnishing inpatient hospital and outpatient hospital services to individuals with no source of third party coverage," *see* §

447.299(c)(14). Defendants argue that a plain reading of the phrase "costs incurred" in subsection (c)(10) must necessarily exclude costs reimbursed by third-party payors because "costs cannot be considered 'incurred' if they are compensated from other sources." Defs.' Summ. J. Mem., ECF No. 25-1 at 14. Defendants attempt to shoehorn private-insurance *payments* into the *costs* portion of the equation set forth by the regulation ignores the necessity of reading the phrase "costs incurred" in context. After all, all other payments — i.e., Medicaid payments, payments from the uninsured, and Section 1101 payments — are expressly considered and subtracted from the *payments* side of the equation. Simply put, subtracting private-insurance payments from the costs side of the equation, while other payments are subtracted from the payments side, is inconsistent with the plain reading of the 2008 Rule. Moreover, because the meaning of "costs incurred" within the text of the 2008 Rule as a whole is clear, defendants' reliance on cases such as *PhRMA* for the proposition that the Secretary's interpretation of "costs" as "excluding amounts that were offset by compensating amounts," *see* Defs.' Summ. J. Mem., ECF No. 25-1 at 14, is unpersuasive.

In sum, defendants' interpretation is unsupported by a plain reading of the text of the 2008 Rule because subsection

(c)(16) contains a specific formula for "uncompensated care costs" that does not exclude private-insurance payments.

> **b.** **Because the Text of the 2008 Rule is Clear, the Preamble Cannot Be Used to Create Ambiguity and Contradict the Text.**

Next, defendants point to the Preamble of the 2008 Rule to argue that the "text contained in the preamble to a regulation can inform the proper interpretation of a regulation." Defs.' Summ J. Mem., ECF No. 25-1 at 16-19. The Preamble explains that "uncompensated care costs" include the "*unreimbursed* costs of providing . . . services to Medicaid eligible individuals and . . . to individuals with no source of third party reimbursement." 73 Fed. Reg. 77904, 77914 (emphasis added). Defendants cite to *United Steel Works of America v. Marshall*, 647 F.2d 1189 (D.C. Cir. 1981), and other cases that they claim make clear that an agency can rely on "preamble text to elaborate on or supplement provisions published in the Code of Federal Regulations." Defs.' Summ. J. Mem., ECF No. 25-1 at 18.

To be clear, the preamble to a statute or rule may be used to help inform the proper interpretation of an ambiguous text. *See e.g., United Steel Workers*, 647 F.2d at 1224 (using the preamble of a regulation to resolve an apparently contradictory standard within the regulation). The preamble cannot, however, be used to contradict the text of the statute or rule at issue. *Nat'l Wildlife Fed'n v. Envtl. Prot. Agency*, 286 F.3d 554, 569-

21

70 (D.C. Cir. 2002). The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has explained:

> The preamble to a rule is not more binding than a preamble to a statute. A preamble no doubt contributes to a general understanding of a statute, but it is not an operative part of a statute and it does not enlarge or confer powers on administrative agencies or officers. Where the enacting or operative parts of a statute are unambiguous, the meaning of the statute cannot be controlled by language in the preamble.

*Nat'l Wildlife Fed'n*, 286 F.3d at 569-70 (citations and internal quotation marks omitted).

Here, the text of the 2008 Rule included a step-by-step guide to calculating the "unreimbursed costs," including specific definitions of what constitutes "costs" and what constitutes "payments". To the extent that these are contradicted by the Preamble of the Rule, the definitions control. *See, e.g.*, *Barrick Goldstrike Mines, Inc. v. Whitman*, 260 F. Supp. 2d 28, 36 (D.D.C. 2003) (when "the preamble to [a] rulemaking is inconsistent with the plain language of the regulation, it is invalid.") (citation omitted). In other words, this is not a situation in which the Preamble to the 2008 Rule is needed to inform the proper interpretation of ambiguous text; rather, the text of the 2008 Rule clearly defines the costs and

payments to be included in the calculation of the hospital-specific limit, and that text must control.[5]

      **c.**     *Seminole Rock-Auer* **Deference Does Not Apply.**

Finally, defendants argue that their interpretation of the phrase "costs incurred" should control because an agency's interpretation of its own regulations are entitled to deference. Defs.' Reply, ECF No. 29 at 21 (citing, *inter alia*, *Auer v. Robbins*, 519 U.S. 452, 462 (1997)).

Under the *Seminole Rock-Auer* standard of deference, a court will grant "controlling weight" to an agency's interpretation of its own regulations "unless it is plainly erroneous or inconsistent with the regulations." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *see also Kaiser Found. Hosps. V. Sebelius*, 708 F.3d 226, 230-31 (D.C. Cir. 2013)("[D]eference is unmerited where the interpretation is

---

[5]    Defendants also point to a 2002 letter from CMS to state Medicaid agencies as further evidence that defendants' interpretation that the Medicaid Act requires subtraction of third-party insurance payments is "longstanding and consistent." Defs.' Summ J. Mem., ECF No. 25-1 at 12. As an initial matter, the 2002 letter is not a legislative rule promulgated through appropriate notice-and-comment procedures, but rather interpretive guidance of the governing statute. Thus, the 2002 letter would suffer from the same procedural deficiencies as FAQ 33 and therefore cannot provide a legal basis for the defendants' policy. Moreover, even if the 2002 letter did support defendants' interpretation as embodied in FAQ 33, the letter conflicts with the plain text of the 2008 Rule, which was promulgated through notice-and-comment procedures.

plainly erroneous or inconsistent with the regulation."). In *Kaiser Foundation*, the court declined to give deference to the Secretary's interpretation because it contradicted the plain language of the regulation. *Kaiser Found.*, 708 F.3d at 230-31. Here too, for all of the reasons set forth above, the Secretary's interpretation as embodied in FAQ 33 is in conflict with the plain text of the 2008 Rule and therefore deference is not warranted.

Accordingly, as neither the text of the governing statute nor the text of the governing rule support defendants' policy, FAQ 33 has an independent legal effect.

### B. Plaintiffs Have Standing to Challenge the Defendants' Enforcement of FAQ 33.

As they did in opposing plaintiffs' motion for a preliminary injunction, defendants argue that plaintiffs lack standing to bring this lawsuit because the plaintiffs fail to meet the redressability requirement for jurisdictional standing. Defs.' Summ J. Mem., ECF No. 25-1 at 9-10. Defendants argue that the Court will be unable to redress plaintiffs' injuries because: (1) FAQ 33 has no independent legal effect; and (2) it is the state health care authorities rather than the federal government that are responsible for recoupment of DSH payments. *Id.* Having determined that FAQ 33 has an independent legal effect, the Court turns to defendants' second argument.

Defendants argue that this Court is incapable of redressing the plaintiffs' injuries because the injuries are caused by the *state* health care authorities, who are responsible for recoupment of payments, and not by the federal defendants. Defs.' Summ J. Mem., ECF No. 25-1 at 9-10. Because the state agencies are not parties to this lawsuit, defendants assert that the Court cannot appropriately redress plaintiffs' injures. *Id.*

The Court addressed this argument in its previous opinion, concluding that "an injunction against the defendants' enforcement of FAQ 33 would likely redress plaintiffs' injuries." *Texas Children's*, 76 F. Supp. 3d at 239. While the state agencies are not parties to this lawsuit, "[t]he recoupment decisions of the state Medicaid agencies are inextricably intertwined with the defendant's enforcement of FAQ 33." *Id.* As the Court's prior opinion explained:

> Standing may be established "on the basis of injuries caused by regulated third parties where the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to the causation and the likelihood of redress." To show this, the D.C. Circuit 'ha[s] required only a showing that the agency action is at least a substantial factor motivating the third party's actions."

*Id.* (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 336 F.3d 930, 938 (D.C. Cir. 2004) and *Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001)).

Further, "Medicaid is a 'cooperative venture between the federal and state governments.'" *Id.* (quoting *Virginia v. Johnson*, 609 F. Supp. 2d 1, 2 (D.D.C. 2009)). In working with state governments, CMS has "significant authority" over state agencies. *Id.; see also* 42 U.S.C. §§ 1316(a), (c)-(e), 1396a and 1396b. Indeed, the record in this case reflects that the state health care agencies have expressed their support for the plaintiffs' position. Harris Decl., ECF No. 16-1 ¶¶ 4-5; Email from Steve Aragon, Chief Counsel, Texas Health and Human Services Commission, to Susan Feigin Harris, Counsel for Texas Children's (Apr. 22, 2013), ECF No. 15-6 at 1. Defendants' control over the state health agencies, coupled with these agencies' beliefs that FAQ 33 is binding on them, indicates that "[a]t a minimum . . . defendants' enforcement of FAQ 33 [is] a substantial factor motivating the third parties' actions." *Texas Children's*, 76 F. Supp. 3d at 239 (citing *Tozzi*, 271 F.3d at 308)). Accordingly, plaintiffs have satisfied the redressability requirement for purposes of finding standing.

C. **FAQ 33 Violates the Administrative Procedure Act.**

Having found that FAQ 33 has independent legal effect and that plaintiffs have standing to challenge its enforcement, the Court turns to whether FAQ 33 violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

The Administrative Procedure Act requires an agency to follow notice-and-comment procedures when proposing new rules, except where the agency is merely promulgating "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b). If an agency does not follow proper rule-making procedures where required, a court can "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Courts only have the authority to review "final agency action[s]." 5 U.S.C. § 704. An action is considered "final" if it is one which "mark[s] the consummation of the agency's decision-making process . . . [and] by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1998).

The APA does not define "interpretive rule," and "its precise meaning is the source of much scholarly and judicial debate." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015). The D.C. Circuit, however, has recognized a four-part test for determining if a rule is legislative or interpretive. Whether "the purported interpretive rule has 'legal effect'" is determined by:

(1) [W]hether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties; (2) whether the agency has published the rule in the Code of Federal Regulations; (3) whether the agency has explicitly invoked its general legislative authority; and (4) whether the rule effectively amends a prior legislative rule. If the answer to any of these questions is affirmative, we have a legislative rule.

*Am. Mining Cong. v. Mine Safety and Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)).

The second and third factors are not contested here: FAQ 33 was not published in the Code of Federal Regulations and CMS did not explicitly invoke its general rulemaking authority in promulgating FAQ 33. The first factor clearly suggests that FAQ 33 is a legislative rule. As discussed above, "in the absence of [FAQ 33]" there is no "adequate legislative basis for . . . agency action . . . to ensure performance of duties" because neither the statute nor the 2008 Rule support defendants' policy. *See supra* Part III.A.

With respect to the fourth factor, "[t]he practical question inherent in the distinction between legislative and interpretive regulations is whether the new rule effects a substantive regulatory change to the statutory or regulatory regime." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6-7 (D.C. Cir. 2011). Notwithstanding

defendants' arguments that FAQ 33 is merely the "type of workaday advice letter that agencies prepare countless times per year in dealing with the regulated community" that "is not binding on the agencies or on third parties," Defs.' Summ. J. Mem., ECF No. 25-1 at 10-11, the Court finds that FAQ 33 effects a substantive change in existing law. As explained above, FAQ 33 modifies the formula for calculating the hospital-specific limit in a manner not provided for by any prior rule or statutory source. *See supra* Part III.A.

Moreover, FAQ 33 "is irreconcilable with a prior legislative rule" and thus "the second rule must be an amendment of the first." *Am. Mining. Cong.*, 995 F.3d at 1109 (internal alterations omitted). As discussed above, the 2008 Rule clearly defines what is included in calculating "uncompensated care costs." *See supra* III.A.2. Thus, FAQ 33, which alters the calculation of the hospital-specific limit, effectively amends the 2008 Rule. This, too, weighs in favor of finding that FAQ 33 is a legislative rule. *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) ("APA rulemaking would still be required if [the agency's Medicare reimbursement calculation] adopted a new position inconsistent with ... existing regulations"); *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014 ("[a] rule is legislative if it ... adopts a new position inconsistent with existing regulations").

Finally, defendants argue that even if the statute or regulations do not compel their interpretation, "that interpretation is at least permissible, and thus is entitled to deference under *Chevron*[.]" Defs.' Reply, ECF No. 30 at 3.

Under the *Chevron* deference standard, a court "must give effect to an agency's rule containing a reasonable interpretation of an ambiguous statute." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 (1984)). In determining whether an agency determination warrants deference, a court first asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." *Chevron*, 467 U.S. at 842. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. However, "[i]nterpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *see also United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) ("administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the

force of law, *and* that the agency interpretation claiming deference was promulgated in the exercise of that authority") (emphasis added).

As explained above, the policy embodied in FAQ 33 is not codified by the Medicaid Act. *See supra* Part III.A.1; *see also Texas Children's*, 76 F. Supp. 3d 224 ("At most, the statute might have delegated to the Secretary the ability to determine *by regulation* that additional payments should be considered.") (emphasis added). And although Congress delegated authority to the Secretary to determine "the costs incurred during the year of furnishing hospital services," 42 U.S.C. § 1396r-4(g)(1)(A), FAQ 33 undisputedly was not "promulgated in the exercise of that authority," *Mead*, 533 U.S. at 227; *see also Christensen*, 529 U.S. at 587. Accordingly, *Chevron* deference is not warranted. *See also, e.g.*, *New Hampshire Hosp. Ass'n v. Burwell*, No. 15-cv-460, 2017 WL 822094, at *9 (D.N.H. Mar. 2, 2017) (because "FAQs 33 and 34 are not regulations . . . . they are not entitled to *Chevron* deference"); *Tennessee Hosp. Ass'n v. Price*, No. 3:16-cv-3263, 2017 WL 2703540, at *7 (M.D. Tenn. June 21, 2017) ("Even if the FAQs were considered regulations, which they are not, *Chevron* deference is not warranted where a regulation is procedurally defective — where, as here, the agency erred by failing to follow the correct procedures in issuing the regulation.").

Moreover, although the Supreme Court has recognized that "an agency's [informal] interpretation may merit some deference" in view of the agency's specialized experience and to support uniformity in agency administration of laws, *Mead*, 533 U.S. at 234, FAQ 33 is not entitled to such deference here. Informal interpretations merit deference to the extent they have the "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Here, the statutory or regulatory interpretation set forth in FAQ 33 lacks the "power to persuade" in view of the plain language of the Medicaid Act, *see Children's Hosp. Ass'n of Texas v. Azar*, No. 17-cv-844, 2018 WL 1178024, at *10-14 (D.D.C. Mar. 6, 2018), and therefore is not entitled to deference.

In sum, because FAQ 33 makes a substantive change to the formula for calculating a hospital's DSH limit and effectively amends the 2008 Rule, it is an attempt to promulgate a legislative rule, not a mere interpretation of a governing statute or regulations. Therefore, the policy embodied in FAQ 33 must be implemented in accordance with notice-and-comment procedures under the APA. Because FAQ 33 was issued without notice and comment, it is an illegally promulgated rule, and the Court must set it aside.[6]

---

[6]    Defendants also argue that "considerations of equity" support denying plaintiffs' requested relief. Defs.' Mem. Supp.

## IV.  CONCLUSION

For the reasons stated above, defendants' motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for summary judgment is hereby **DENIED**, and plaintiffs' motion for summary judgment is hereby **GRANTED.** An appropriate order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:     **Emmet G. Sullivan**
            **United States District Judge**
            **June 1, 2018**

---

at 20. Defendants argue that if state authorities are unable to recoup payments from plaintiffs, other hospitals "that treated greater numbers of Medicaid-eligible patients without private insurance" would receive lower Medicaid DSH payments." *Id.* Plaintiffs counter that considerations of equity weigh in their favor because the DSH payments they receive still do not make them whole based on the high number of Medicaid eligible children they treat. But it is not the Court's role to evaluate the merits of the challenged policy; rather, the Court's task is simply to decide whether FAQ 33 violates the APA. Having concluded that it does, the Court declines to reach plaintiffs' second argument that FAQ 33 is a substantive violation of the Medicaid statute. In any event, the Court's intervening resolution of a challenge to a rule capturing the policy set forth in FAQ 33 effectively decides this issue. *See Children's Hospital Ass'n of Texas v. Azar*, No. 17-844, 2018 WL 1178024 (D.D.C Mar. 6, 2018).